### LEVINE v. CARRELL et al.
### No. 2919.

Court of Civil Appeals of Texas. El Paso. Jan. 25, 1934.

Rehearing Denied Feb. 12, 1934.

J. Lee Zumwalt and Sullivan & Wilson, all of Dallas, for appellant.

Shelby S. Cox and Lawther, Cox & Cramer, all of Dallas, for appellees.

PELPHREY, Chief Justice.

This suit arose following an operation performed by Dr. Carrell, one of the appellees, upon appellant.

The action of the trial court in sustaining special exceptions to certain portions of the petition and in instructing a verdict for appellees being made the basis of several assignments of error, we shall here quote the material parts of appellant's second amended original petition upon which the case was tried:

"II. That the defendants, Dr. W. B. Carrell, Dr. S. Driver and Dr. P. M. Girard are each practicing physicians and surgeons in the City of Dallas, Texas, and were such at the times hereinafter stated, and they hold themselves to the public and to the plaintiff herein as possessing such care, skill, and diligence as is ordinarily possessed by the average member of the medical and surgical profession in good standing in said City in diagnosing diseases and defects of the body, and in remedying the same by medical and surgical treatments, and, in fact, held themselves out to the public and to this plaintiff as possessing greater skill and ability than the ordinary physicians and surgeons in good standing in said City at the times hereinafter stated, and, in fact, claimed to the public and to the plaintiff to be specialists in surgical lines, and specialists in body structure, reconditioning and correcting defects of the human body by medical and surgical treatment and operations, at the time of the matters hereinafter complained of. That they are and were engaged in said practice and doing business under the name of Carrell-Driver-Girard Clinic in said City, which they own and operate, and were operating at the time of the matters

herein complained of, and the same is under their personal supervision and control.

"III. That on the 10th day of February, 1931, and prior thereto, plaintiff could not raise her right arm and hand to a position at and above her head, so as to use the same in that position to comb her hair or in eating, but in all other respects said arm and hand was capable of the same use as her left arm and hand. That she had perfect use of her left arm and hand, and neither arm and hand was defective in any respect, except inability to raise the right arm as aforesaid.

"That both arms were fully developed and were useful for all purposes with the exceptions as aforesaid. That at the time and prior thereto she was a typist by trade and profession, and had been for several years. That in her work as a typist she could and did use her right arm and hand with the same skill and use as her left arm. That on account of the fact that she could not raise her right arm and hand as above stated, she consulted the defendant, Dr. W. B. Carrell, with reference to same, and a few days before the 10th day of February, 1931, and on said occasion said defendant advised her he could operate upon her said right arm and make it almost as perfect as her left arm, and that it would be in all respects the same as her left arm so far as using it was concerned, and her left arm was at that time in perfect condition and could be freely used for all purposes, which fact was known to said defendant. He further stated that the operation was only a minor one, and after said operation she would have just as good use of her right arm and hand as she had of her left arm and hand in every respect, and especially in raising the same to and above her head to comb her hair and to eat, or any other use she might desire to make of her said arm and hand. In this connection, she alleges that at all times she could freely raise her left arm and hand to and above her head, and on account of the condition of her right arm as above stated, she always used her left arm and hand in combing her hair and eating. That she has never had any trouble of any kind in freely using her left arm and hand at all times and for all purposes.

"The defendant further told her that said operation was only a minor one and would only require fifteen or twenty minutes and she would be in a hospital for only a few days on account thereof, and that in a short time after said operation she would be able to use her said right arm and hand just as freely as she could and did use her left arm and for all purposes. That the statements so made were made for the purpose of inducing

plaintiff to rely upon the same and to believe that said operation would accomplish the result claimed by the defendant, and that there could not be any doubt as to the result of said operation. That the plaintiff did believe and rely as aforesaid and was induced to employ said defendant to perform the operation upon her right arm. That after much advising with the defendant, Dr. W. B. Carrell and relying upon his statements, she finally consented to permit him to operate upon her said right arm, and on the 10th day of February, 1931, she entered Baylor Hospital at Dallas, Texas, where the operation was to be performed. That on said date the defendant, Dr. W. B. Carrell, did, at said hospital, operate upon her said right arm, cutting muscles, leaders, ligaments, tendons, and tissues and by cutting into the fleshy part of said arm and the shoulder muscles, leaders, ligaments, and tendons thereof and thereto.

"IV. Plaintiff further says that from the time of the said operation on her said arm by the defendants, she suffered and has continued to suffer great physical suffering and mental anguish by reason of said operation. That the defendant, Dr. W. B. Carrell, repeatedly told her before performing said operation that she would recover perfectly from said operation within a short time. The defendant further told her that he had performed many such operations and that each one had been a success and that there was no question about the operation which he proposed to perform upon her said arm being a success, and that her said arm would be made as useful as her left arm and the right hand would be made as useful as her left hand. Further, the defendant herein, promised her to accomplish such result by said operation. That the defendant made said representations and statements and promises to the plaintiff for the purpose of inducing her to employ him to perform said operation and pay him therefor. That she did rely upon said representations and statements and promises and the same were material and caused her to employ him to perform said operation and to have said operation performed.

"V. That by reason of the representations, statements and promises of the defendant to the plaintiff, she was thereby induced to employ these defendants to perform said operation, and they and each of them, expressly or impliedly contracted to accomplish the result promised to this plaintiff by reason of said operation upon her said arm. That thereby the plaintiff became entitled to receive the result promised by the defendant, Dr. W. B. Carrell. That she paid them the charges de-

manded, as well as the hospital charges and other expenses incurred by reason of said operation.

"VI. Plaintiff further says that from the date of said operation, she has suffered intense physical pain and mental anguish, and that as a result of said operation her said arm has been in a worse condition than before, and that instead of the same being left in the condition promised as aforesaid, said arm was left in a much worse condition than it was before said operation. That said condition will not improve, but will become worse. That the circulation in said arm is impaired and her ability to use said arm is permanently impaired. That she is now unable to follow her profession as a typist or to do any other kind of work because she is unable to use said arm and hand, and this condition is permanent. That her said arm is now permanently impaired as a result of said operation.

"VII. Plaintiff further says that the defendant performed said operation on her said arm without first making an X-Ray thereof, as he should have done. That she called attention to the fact that an X-Ray examination should be made of said arm, but the defendant informed her that an X-Ray was not necessary on account of the operation being a minor one.

"VIII. Plaintiff further alleges that since said operation she has frequently consulted with the defendants, especially Dr. W. B. Carrell, and he has informed her that he would like to perform another operation upon her said arm, and that with another operation he could secure the result promised by the first operation, but afterwards he stated that he would not guarantee the result of a second operation. That the reason why he desired to perform another operation as stated by him was that there was one leader in her arm that he wanted to cut and operate on, which he should have cut and operated on when he performed the said operation on her arm. The plaintiff has not consented to another operation on account of the condition the operation complained of herein left her said arm in, as she fears another operation by the defendants might cause the total loss or total use of said arm.

"IX. Plaintiff further represents that on account of the contractual relations existing as above stated when said operation was performed and the failure of the defendants to accomplish the result promised, she is entitled to recover the damages hereinafter stated.

"X. She alleges that she is entitled to recover, because of the negligence of the defendants, and each of them, in failing to properly diagnose the condition of her said arm, and in failing to have an X-Ray made of her said arm in order to determine the condition of the same, and the need of the operation, and the result of the same, and further, they were guilty of negligence in performing the character of operation they did upon her said arm, and further, were guilty of negligence in the performance of the said operation they did perform upon her said arm by reason of the facts hereinbefore stated and alleged.

"XI. Plaintiff further represents and shows to the court that on account of the carelessness and negligence of the defendants herein, and each of them, and their failure to properly diagnose and to perform a proper operation, that the plaintiff has been permanently disabled for life, and that she has been permanently scarred and disfigured for life, and that on the upper portion of her right arm she has a long deep ugly scar, some four or five inches long and from one to one-half inches in width, and which is a permanent scar, and that the same causes the plaintiff much embarrassment and mental suffering and pain, and further, that instead of the plaintiff being on the operating table fifteen or twenty minutes as the defendants told her she would be, that she was on the said operating table one hour and forty-five minutes, and that thereafter she was in the said clinic some six weeks, and that she wore the said brace six weeks regularly, and then at different intervals she wore the same for a long time; all of which caused her much suffering, physically and mentally.

"XII. Plaintiff further says to the court that she is permanently and totally disabled, and that she will never be able to use the said right arm, and that at the time of said operation she was employed as aforesaid, and that she was earning and capable of earning the sum of $25.00 to $35.00 per week, and that she had been employed for a number of years, following her trade and profession as aforesaid, and that on account of the said operation so performed on her right arm by the defendants, and each of them, as aforesaid, she will never be able to use her said arm, and therefore, she will be unable to follow her line of work as a typist and that she has no other occupation by learning and trade, and that on account of the physical pain and mental suffering caused this plaintiff by the wearing of the said iron brace or contraption as aforesaid, and on account of the permanent and total disability of the plaintiff, as aforesaid, she had been damaged in the sum of

$50,000.00 all of which the defendants, and each of them, are bound and liable for."

Appellees answered by general demurrer, special exceptions, general denial, a special denial that they were guilty of any carelessness or negligence in either the diagnosis or the operation, and that they warranted or guaranteed that the operation would improve the conditions of appellant's arm. They further alleged that they diagnosed appellant's condition and performed the operation to the best of their skill and ability and in accordance with the methods of their school of medicine and surgery in the locality of Dallas.

At the conclusion of appellant's testimony, the trial court instructed the jury to return a verdict in favor of appellees, and this appeal followed.

### Opinion.

Appellant's propositions 3 to 8 all deal with the court's action in instructing a verdict; appellant's contention being that the evidence was, at least, sufficient to raise an issue as to whether appellees had breached their express contract to remedy the condition of appellant's arm and as to whether they had been guilty of negligence in performing the character of operation they did perform and in the manner in which they performed such operation. As to an express contract, we find the following in the testimony of appellant:

"Q. When was the first time you saw Dr. Carrell in reference to your arm? A. In 1930 was the first time I met him.

"Q. Did you see him any other time after that? A. I saw him that first time. I talked to him and he told me that he was positive he could fix it and for me to come back the next day and he would study it over and tell me for sure, so I came back the next day and he told me that he could do it and it would be absolutely satisfactory and perfect and he told me to come back after the convention because it was not where it had to be done quickly and he was busy with the other doctors and of course I could wait so we let it go for awhile.

"Q. After that when did you next see him? A. After that I waited until next year and I saw him a few days before the operation.

"Q. When you saw him a few days before the operation tell the jury what you said and what he said? A. The first time when Dr. Carrell saw me it was a long time, I thought he would not recognize me but he did, he said if you had come like I told you you would

have been perfectly all right now, but you see it was just like it was. So I said we can do it right now and he looked at my arm again and then he called in Dr. Driver and Dr. Girard. * * *

"Q. Before you had the operation I believe you stated you had a conversation with Dr. Carrell? A. I saw him several times before the operation because I wanted to be sure it would be all right because it didn't have to be done.

"Q. During these conversations before you had the operation, fix the time the best you can, what, if anything, did he say would be the result of the operation? A. Dr. Carrell told me that if someone else would have cut it before, if it had been operated on, he would not have taken the job for anything, because he said it can hardly be fixed if somebody else has already cut once, but he says this would be the first time and he said he could positively fix it where it would be much better in every way, that if he couldn't he would not take it at all, and he mentioned cases where he did that kind of case and he said they were satisfactory in every way.

"Q. Did he make any other statement to you about the operation and the effect of it or anything of that kind? A. The only statement I really wanted and insisted on was to tell me if he could fix my arm and how well he could fix it, of course he promised me that in every way he could make it just so, that's the only promise I really asked for and wanted.

"Q. Did he make any statement about your left arm with reference to the operation? A. He said my right arm would be like my left arm when he got through with it.

"Q. Did you rely upon these statements that the doctor made to you about the result of this operation? A. Of course I did, I had enough confidence that if he undertook it he could do it, he said if he couldn't fix it well he would not do it and I didn't think he would cripple me; I thought he knew what he was doing, he was at it long enough so I took his word, I didn't expect him to sign a contract.

"Q. You relied upon that, is that the reason why you employed him to perform the operation? A. Yes."

■ This evidence, in our opinion, clearly raised an issue as to an express agreement on the part of Dr. Carrell that the operation would improve the condition of appellant's arm, and the court therefore erred in instructing a verdict.

Dr. Collier testified relative to his examination of appellant's arm:

"Q. I will ask you if you have examined her arm in the last few weeks? A. Well, I examined it at one time only.

"Q. I wish you would tell the jury what you found the condition of her arm to be? A. Well, I found a scar something like three or four inches long is my recollection, in the right arm which was made as the result of an operation.

"Q. Can you tell whether any muscles or ligaments or tendons or anything of that kind had been cut? A. It didn't look a bit like it had; it don't look like there had been any muscles cut but it does look like there had been a muscle removed or placed a little out of the line to the original line.

"Q. The muscles have been moved? A. It looks that way but I would not say for sure.

"Q. Explain to the jury whether the muscle has been moved up or down or to the side? A. My recollection is it was moved to the right, it seems to be shoved over a little bit, slightly outward to the right, I couldn't say it had, I would not do that.

"Q. What is your opinion? A. My opinion is it has been.

"Q. What did you find underneath the arm? A. I found a tendon there that seemed to be too tight, it seemed not to relax.

"Q. I will put it this way, assuming that this girl could not raise her right arm to her head and that an operation was to be performed for the purpose of remedying that condition, I will ask you as a doctor, in your opinion what kind of an operation should have been performed? A. I think I told you, if I haven't I will state that the weakening or clipping of that tendon might help.

"Q. That tendon under the arm? A. Yes, the tendon on the lower part of the arm.

"Q. That is the tendon you say had not been cut? A. Yes.

"Q. Well, what about the muscle? A. Which muscle do you refer to?

"Q. I am asking in your opinion should or should not the muscle have been moved to the side, you said they were moved? A. That is a pretty hard question for me to answer, I can only give you an opinion, my opinion is I would not have done it.

"Q. What part was cut there, was there any ligaments or leaders or tendons cut? A. I would think not, I think the incision indicated to me that it was a cut into the muscles and the muscles slipped over a little to the right, that is the way it looked to me.

"Q. Just cut a muscle and moved it to the side? A. I don't think they cut the muscle.

"Q. All right, if you could not raise the arm since the operation what effect would you say the operation has had, if any, upon that part? A. I couldn't say that it has had any, I would not be positive about it but I think I could say this tendon if it was weakened a little, she would have better use of her arm.

"Q. I will ask you this question, assuming that she could not raise the arm to her head, and having examined the condition as you found it and find it now, what in your opinion as a doctor would have been the proper operation to have performed to remedy that condition? A. I might be like some others, I might not know.

"Q. Give your opinion anyway. A. If I had been treating that arm myself I think the first thing I would have done, it would have been to weaken the tendon in order to have enabled her to raise her hand upward, that is the way I feel about it with the information before me.

"Q. In your opinion was the cut on the shoulder the proper thing to have done, or, simply loosened that leader? A. Sometimes no physician knows just the proper thing.

"Q. What is your opinion of it? A. If I had been operating, I would have operated on that tendon first.

"Q. I will ask you your opinion—from your examination of her arm, seeing that leader and the cut on the shoulder and that the only operation is on the shoulder and none on the leader, I will ask you in your opinion whether or not the operation that was performed without cutting any of the leaders away, whether that was a proper or an improper operation? A. Well, I believe I told you one time if I had been doing it I would have used the other first, then I don't know what I would have done.

"Q. But the other was not done, this cut of the leader was not affected. In your opinion as a doctor would you say that that was a proper or an improper operation for the purpose of enabling her to raise her arm? A. I fail to see how that would enable her to raise her arm."

Miss Levine testified as to certain conversations with Dr. Carrell:

"Q. I will ask you this question, Miss Levine, since the operation have you at any time had a conversation with Dr. Carrell in which he made any statement about this operation,

whether it was successful or unsuccessful? A. Yes.

"Q. In November, 1931, the last time you saw him, did you have any conversation about it then? A. We talked about it and I told him that it seemed like it was worse then than it ever was and he said he would do it over, operate again on my arm.

"Q. Did the doctor at this conversation tell you what he did or what he failed to do in this operation, if anything? A. He told me that he felt this part right here where it is so tight—

"Q. Is that the leader? A. I don't know.

"Q. That part right under your shoulder? A. He said that by cutting this it would be better.

"Q. What, if anything, did he say why he didn't cut that place? A. He said somehow he overlooked it."

■ We agree with appellant that the above-quoted testimony was sufficient to raise an issue as to negligence in the performance of the operation.

The court, we think, properly sustained the special exception to paragraph 8 of the petition.

■ Appellant is depending for recovery upon the negligence of appellees in the performance of the operation and upon a breach of contract to improve the condition then existing in her right arm. The matters alleged in paragraph 8 would, at most, be only evidence of the ultimate fact of negligence.

The fact that Dr. Carrell wanted to perform another operation and cut and operate on a leader in her arm which he had failed to cut in the operation would not give appellant a cause of action against appellees. These facts would be admissible on the issue of negligence, but, being merely evidence, had no place in the pleadings. McCauley v. Long & Co., 61 Tex. 74.

■ The special exception to paragraph 7 was likewise properly sustained. Appellant did not allege that an X-ray examination was in any way necessary for a proper diagnosis of her condition, neither did she allege any facts showing such a necessity.

It appears to be undisputed in the record that the operation which was performed and the one which should have been performed was entirely upon the muscles and tendons; therefore an X-ray examination could not have revealed anything which would have aided in a diagnosis of her condition or in the performance of the operation itself.

Appellant's brief contains some other assignments as to the exclusion of certain proffered testimony of appellant and of Dr. Collier.

In view of the fact that the judgment is to be reversed, we shall not discuss the questions presented by those assignments further than to say that appellant should be permitted to testify to any and all facts in support of the cause of action alleged, and that Dr. Collier, having qualified as an expert, was entitled to give his opinion as to any matters which were by the pleadings material to either appellant's cause of action or appellee's defense.

The judgment of the trial court is reversed, and the cause remanded.