Shirley **KARP**, Individually, as Executor of the Estate of Haskell Karp, and as next friend of Joel Karp and Martin Karp, Minors, and Harry Michael Karp,

v.

**Denton A. COOLEY et al.**

**Civ. A. No. 71–H–369.**

United States District Court,
S. D. Texas,
Houston Division.

Oct. 18, 1972.

John H. Holloway, Houston, Tex., for plaintiffs.

Thomas B. Weatherly, Vinson Elkins, Searls & Smith, Houston, Tex., for defendant Denton Cooley.

Charles D. Boston, Fulbright, Crooker & Jaworski, Houston, Tex., for defendants Sam Calvin and St. Lukes Episcopal Hospital.

A. J. Watkins, Watkins & Hamilton, Houston, Tex., for defendant Domingo S. Liotta.

## ORDER

SINGLETON, District Judge.

After nine days of trial in the above-captioned malpractice suit based on diversity jurisdiction, the joint motion of defendants Cooley and Liotta for a directed verdict was granted. Fed.R.Civ. P. 50(a). The granting of said directed verdict is based on the following facts and conclusions.

Haskell Karp had a medical history revealing past coronary problems. He had scarlet fever at the age of fifteen. In 1959, at the age of thirty-seven, he had his first heart attack and was hospitalized approximately two months because of diffuse anterior myocardial infarction. In 1961, he began to have episodes of ventricular extrasystoles and was placed on Quinidine. In 1963, he suffered another episode of severe chest pains. In 1966, he had a second acute myocardian infarction on the diaphragmatic surface. After 1966, Mr. Karp had four or five other episodes of infarction or possibly coronary insufficiency. Several times he was hospitalized with severe chest pains but with no EKG or enzyme changes. In April, 1968, he had a syncopal episode and subsequently had an implantation of a Demand pacemaker (heart pacer) placed transvenously into the right ventricle. In September, 1968, he had begun to have episodes of dyspnea, orthopnea, paroxysmal nocturnal dyspnea and developed congestive heart failure. Because of this his pacemaker rate was increased to 72 beats per minute. In spite of this action, he developed heart failure, complained of angina, dyspnea on exertion and edema. Selective cine coronary arteriograms revealed that he had severe three vessel disease, occluded right coronary and also his anterior descending and circumflex branches were occluded somewhat distally. Cardiac catheterization confirmed the fact that he had moderate pulmonary hypertension. A left ventricular cine angiogram showed the presence of an adynamic area in the left lateral wall of the left ventricle. As this point in Mr. Karp's medical history, his Chicago, Illinois, physicians referred him to Dr. Denton Cooley in Houston, Texas, for further treatment and consideration of resection of the adynamic or fibrotic area of the myocardium.

Accordingly, on Monday, March 3, 1969, Mrs. Karp telephoned Dr. Cooley long-distance to set a day when he might see Mr. Karp. Two days later, Wednesday, March 3, 1969, Haskell Karp, 47, accompanied by his wife, was admitted into St. Luke's Episcopal Hospital, Houston, Texas. Upon admission, Mr. Karp signed (as was later established at trial by a handwriting expert) an authorization for medical and/or surgical treatment (TR. EX. 1) which reads:

"I hereby authorize the physician or physicians in charge of Haskell (None) Karp to administer any treatment; or to administer such anesthetics; and perform such operations as may be deemed necessary or advisable in the diagnosis and treatment of this patient.

Date 3/5/69 Signed /s/ Haskell Karp"

Witness /s/ Wauneta F. Tappan

Mr. Karp remained as a patient in the hospital for several weeks being examined and treated by several doctors associated with the hospital. During this period of time, Dr. Cooley suggested that Mr. Karp's desire for a more active and productive life-style could best be achieved by a heart transplant. Mr. Karp rejected this suggestion and preferred to undergo ventriculoplasty surgery (wedge procedure) which Dr. Cooley had developed. (All rights under the Dead Man's Statute have been waived.) This surgery necessitates the excision of part of the diseased tissues in the left ventricle in order that the remaining tissue and heart muscle can function at its optimal level.

As regards the informed consent issue, Dr. Cooley testified that he discussed various aspects of the surgery in question with Mr. Karp on at least three

occasions: once the week before April 4, again at 10:30 p. m. on the night of April 2, and a brief chat on April 3. According to Dr. Cooley's testimony, of these the most significant was that of April 2. On that occasion, Dr. Cooley explained to Mr. Karp that the ventriculoplasty surgery could be performed on Friday, April 4, 1969. Dr. Cooley testified he explained the risks, grave dangers and backup procedures involved therein. Further, he explained to Mr. Karp that there was a "70–30" chance of his surviving the ventriculoplasty operation. Dr. Cooley explained, as was stated in the written consent form, that if death appeared imminent that his heart would be removed and a mechanical heart substitute (sometimes referred to as the Cooley-Liotta mechanical heart) inserted. Dr. Cooley testified that he told Mr. Karp the mechanical heart substitute would not be permanent but would be replaced as soon as possible by a human heart transplant, but that at that time there was no heart donor available, nor any prospect of one. Dr. Cooley also testified that he promised Mr. Karp he would do all that is humanly possible to insure his well-being and improve his patient's, that is, Mr. Karp's, condition. At that time, Mr. Karp gave him his verbal consent to the surgery.

Mrs. Karp testified that if Dr. Cooley did see her husband that evening (April 2, 1969) that it would have to have been very late for she usually stayed until after 10:00 p. m. with her husband. However, she also testified that on the night in question she went out to dinner at a friend's home late in the evening and did not return to the hospital that night until after this dinner and visit.

Rabbi Wilkin, a Jewish chaplain for the medical center who had been calling on Mr. Karp daily since his admission to the hospital, testified that on one of the days during the week of the surgery (week beginning Monday, March 31, 1969) Mr. Karp had an urgent message sent to him to come to his room. The Rabbi went to his room where he found Mr. Karp alone. Mr. Karp related to the Rabbi the news that he was to be operated on and discussed with the Rabbi the chances of his surviving such surgery as well as the back-up procedures and the fact that he would be the first human recipient of the mechanical heart substitute if the wedge procedure failed. There was no testimony given at the trial to refute Rabbi Wilkin's statements as to his conversations with Mr. Karp.

Mrs. Karp testified that the first time she heard about the impending surgery that had been scheduled was from her husband on Thursday morning, April 3. She also stated that Dr. Cooley came to her husband's room Thursday evening and told both of them that Mr. Karp's condition had taken a turn for the worse and if surgery was not done soon Mr. Karp would die of a "burst aneurysm." Mrs. Karp felt that Dr. Cooley was insistent and very impatient for Mr. Karp to sign the specially prepared surgical consent and to be on his way. She further testified that she did not fully understand the risks involved in the various procedures; however, she did remember specifically asking Dr. Cooley what the words "mechanical cardiac substitute" meant and receiving an explanation.

Dr. Cooley testified that neither good medical standards nor his own personal practice would permit him to tell a patient that his condition was without hope and that he was going to die. Dr. Cooley also stated that his medical opinion, as repeatedly expressed in articles published prior to and subsequent to Mr. Karp's surgery, is that an aneurysm does not burst. He emphatically testified that he could not have stated to the Karps that if surgery was not done soon Mr. Karp would die of a "burst aneurysm."

In regard to Mr. Karp's condition during that first week of April, Dr. Cooley stated that he had determined that Mr. Karp's heart pacer was failing and that, if it began to skip four or five impulses a minute instead of the two or three that it was skipping, Mr. Karp's death would result. This is why the

surgery was scheduled with Mr. Karp's consent two days in advance of its actual occurrence.

Mr. Henry C. Reinhard, a St. Luke's Hospital administrator, testified that Thursday, April 3, 1969, he went to Mr. Karp's room where he found Mr. Karp alone and asked him if he had any questions regarding the surgical consent. They chatted for awhile and then Mr. Reinhard left the room. Mr. Reinhard further testified that on the day of surgery, Friday, April 4, 1969, he went to Mr. Karp's room where he found both Mr. and Mrs. Karp present. He asked Mr. Karp if the signature on the following consent form as principal was his true signature wherein Mr. Karp replied affirmatively. Mr. Reinhard then asked Mrs. Karp if the signature as witness on the following consent form was her true signature wherein she replied affirmatively. Having explained to them that he wanted to verify the signature so that he could place his own name on the form, Mr. Reinhard witnessed, as Mrs. Karp had previously done, the following consent form:

"I, Haskell Karp, request and authorize Dr. Denton A. Cooley and such other surgeons as he may designate to perform upon me, in St. Luke's Episcopal Hospital of Houston, Texas, cardiac surgery for advanced cardiac decompensation and myocardial insufficiency as a result of numerous coronary occlusions. The risk of this surgery has been explained to me. In the event cardiac function cannot be restored by excision of destroyed heart muscle and plastic reconstruction of the ventricle and death seems imminent, I authorize Dr. Cooley and his staff to remove my diseased heart and insert a mechanical cardiac substitute. I understand that this mechanical device will not be permanent and ultimately will require replacement by a heart transplant. I realize that this device has been tested in the laboratory but has not been used to sustain a human being and that no assurance of success can be made.

I expect the surgeons to exercise every effort to preserve my life through any of these means. No assurance has been made by anyone as to the results that may be obtained.

"I understand that the operating surgeon will be occupied solely with the surgery and that the administration of the anesthetic(s) is an independent function. I hereby request and authorize Dr. Arthur S. Keats, or others he may designate, to administer such anesthetics as he or they may deem advisable.

"I hereby consent to the photographing of the operation to be performed, including appropriate portions of my body, for medical, scientific, and educational purposes.

WITNESSES: Signature /s/ Haskell Karp"
 HASKELL KARP
/s/ Mrs. Haskell Karp
Mrs. Haskell Karp (wife)
/s/ Henry C. Reinhard Jr.
Henry C. Reinhard, Jr.

In the early afternoon of April 4, 1969, Mr. Karp was rolled into the hall of the surgical ward. Dr. Arthur S. Keats, the anesthesiologist, passed the patient on his way to the operating room at approximately 1:55 p. m. Dr. Keats testified that he was alarmed by Mr. Karp's groaning and complaints of shortness of breath. Dr. Keats further testified that after observing Mr. Karp's coloring and profuse sweating it was his medical opinion that Mr. Karp would expire in the hallway if something was not done immediately. Dr. Keats sent word to Dr. Cooley that the operation should begin as soon as possible, and by approximately 1:20 p. m., Mr. Karp was on the heart-lung oxgenator (commonly referred to as the heart-lung bypass machine). This procedure normally takes twice as long to complete, but the doctors testified that the procedures were hurried in an attempt to save Mr. Karp's life.

Dr. Cooley then performed the wedge procedure on Mr. Karp's left ventricle. This surgery revealed that Mr. Karp's heart had extensive scarring and damage. Approximately 35% of the left ventricle was removed. After the

832

surgery had been completed in its normal and customary fashion, the heart began to fibrillate. This was corrected by electrocally shocking the heart. However, according to the only medical testimony given on the subject, the strength of the heart's contractions were not sufficient to sustain life in Mr. Karp. Therefore, according to back-up procedures outlined in the written consent form, Dr. Cooley, assisted by Dr. Liotta, removed the heart and implanted the mechanical heart substitute.

Mr. Karp regained consciousness and lived on the mechanical heart substitute for approximately 64 hours. During this period of time Dr. Cooley and Mrs. Karp made public appeals through the news media for a human heart donor. On April 7, 1969, at 6:30 a. m., Mr. Karp underwent surgery to remove the mechanical heart and to replace it with a human heart. His urine output was low after the first surgery, and after the second, he became anuric despite all measures to reverse the condition. Mr. Karp died on April 8, 1969, at 3:15 p. m.

An autopsy was performed revealing acute bronchopneumonia, primarily in the right lung due to pseudomonas aeruginosa, and there was evidence of tubular necrosis of the kidney with focal fibrin thrombi of the glomeruli. There was evidence of chronic passive congestion of the liver. There was evidence of hemorragic cystitis and terminal gastric hemorrhage. There was splenomegaly with lymphoid depletion and also lymphoid depletion of the lymph nodes. His death was attributed to bronchopneumonia and acute renal failure. (Plaintiffs' Exhibit No. 1)

After Mr. Karp's death, Mrs. Karp returned to her home in Illinois where she wrote numerous laudatory letters about Dr. Cooley and also wrote an outline for a book about her husband's medical experiences. This manuscript told of Mr. Karp's rapidly deteriorating physical condition before surgery and of both Mr. and Mrs. Karp's eagerness for Dr. Cooley to perform surgery on Mr. Karp. Then in the fall of 1969, Mrs. Karp, in-

dividually and as Executor of the Estate of Haskell Karp, and their three sons filed suit against Doctors Cooley and Liotta for damages sustained by Mr. Karp and by plaintiffs under the Texas Wrongful Death Statute. Plaintiffs allege among other things: that the consent to the operation was fraudulently obtained; that it was not an "informed consent"; that under the circumstances the defendants were negligent in performing the corrective surgery, implanting the mechanical heart, and submitting the patient to the surgery for inserting the human donor heart; and that by fraudulent deceptive practices Mrs. Karp was used by defendants to secure a human heart donor.

This court, in ruling on a motion for a directed verdict, must be guided by the criteria set forth by the Fifth Circuit, sitting en banc, in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1965):

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a con-

flict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

In regard to the issue of informed consent, the Texas courts have clearly established the amount of information a doctor needs to impart to a candidate for surgery.

The court in Anderson v. Hooker, 420 S.W.2d 235 (Tex.Civ.App. El Paso— 1967, N.R.E.) (medical standard did not require defendant physician to disclose prior to surgery that another patient had had a stroke after such surgery) reviewed the Texas standards:

"As a generalization, it may be said that every normal human being of adult years has a right to determine what shall be done to his own body, and a patient's consent is thus a necessary prerequisite to any treatment or operation. And to that may be added that one who gives his consent must have such information regarding the consequences as is necessary to form the basis of an intelligent consent. The duty of the physician to furnish the patient with sufficient information to make an intelligent decision—to disclose risks inherent in proposed treatment or surgery—is recognized. Wilson v. Scott, 412 S.W.2d 299 (Tex. Feb. 1967); Gravis v. Physicians & Surgeons Hospital of Alice, Tex.Civ.App., 415 S.W.2d 674 (n. w. h.). One writer has observed that the reported cases present much confusion as to what risks a physician should disclose to his patient before obtaining consent to operate. Vol. 44 Texas Law Review 799, 800. Both of the above-cited cases quote from the recent opinion by the Supreme Court of Missouri in Aiken v. Clary, 396 S.W.2d 668, 674, as follows:

" 'We have reexamined this question and have concluded that the question of what disclosure of risks incident to proposed treatment should be made in a particular situation involves medical judgment and that expert testimony thereon should be required in malpractice cases involving that issue. The question to be determined by the jury is whether defendant doctor in that particular situation failed to adhere to a standard of reasonable care. These are not matters of common knowledge or within the experience of laymen. Expert medical evidence thereon is just as necessary as is such testimony on the correctness of the handling in cases involving surgery or treatment. In Fisher v. Wilkinson, Mo., 382 S.W.2d 627, 632, we held: "Without the aid of expert medical testimony in this case a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances." And, as we said in Pedigo v. Roseberry, 340 Mo. 724, 736, 102 S.W. 2d 600, 607: "Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury * * * (or an illness) was negligent notwithstanding, for instance, the uncontradicted competent testimony establish(ing) that the uniformly adopted practice of the most skillful surgeons (or physicians) had been followed." The question is not what, regarding the risks involved, the juror would relate to the patient under the same or similar circumstances, or even what a reasonable *man* would relate, but what a reasonable *medical practitioner* would do. Such practitioner would consider the state of the patient's health, the condition of his heart and nervous system, his mental state, and would take into account, among other things, whether the

risks involved were mere remote possibilities or something which occurred with some sort of frequency or regularity. This determination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed.'

\*　　\*　　\*　　\*　　\*　　\*

" . . . in Wilson v. Scott (supra), our Supreme Court held that the plaintiff had the burden to prove by expert medical evidence what a reasonable medical practitioner of the same school and same or similar community, under the same or similar circumstances, would have disclosed to his patient about the risks incident to a proposed treatment."

The only testimony presented by doctors from this community in the same or similar school, on the information given to patients about their surgeries in this community did not vary from the criteria just discussed, namely, that each doctor must use his medical judgment as to whether certain disclosures of risks would have an adverse effect on the patient so as to jeopardize the success of the proposed therapy. Dr. Beasley, Dr. Hamaker, Dr. Keats, and Dr. Cooley all testified that it often is advisable to deliberately withhold information from a patient that would unduly distress him. Dr. H. L. Beasley testified that this notation on Mr. Karp's chart on March 7, 1969, "I am not completely sold that this is a candidate for surgery" (Plaintiffs' Exhibit No. 1—Dr. Beasley's handwritten notation of 3–7–69) had reference to Mr. Karp's poor emotional attitude towards his hospitalization. All the medical testimony stated that emotional attitude and depression would affect what they would relate to a patient.

■ In making the determination of what to tell a patient about his surgery, a doctor must decide on what details he will give. The courts have developed the following approach with regard to details of surgery:

"Surgical operation may consist of many steps and involve many specialists. It would, indeed, be unreasonable and undesirable to place a burden of full and complete disclosure upon each and every specialist involved as to the specific methods intended to be used in an operation and all of the possible risks involved in each step of an operation. See Hall v. United States, D.C., 136 F.Supp. 187, affirmed 5 Cir., 234 F.2d 811." Bell v. Umstattd, 401 S.W.2d 306, 313 (Tex. Civ.App., Austin—1966, error dismissed) (Not sufficient evidence for a jury question whether anesthesiologist was negligent in inserting endotracheal tube.)

■ Upon a review of all the evidence produced, it could not be concluded by a jury that Dr. Cooley had violated the medical standard in this community by the information he gave or did not give to Mr. Karp concerning his surgery. Therefore, the defendant Cooley fell within the guidelines set out in Wilson v. Scott, 412 S.W.2d 299, 301 (Tex.1967) (doctor was held to have given patient sufficient information on a stapedectomy):

"Physicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure. Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (Ct.App. 1957); Bowers v. Talmage, 159 So.2d 888 (Fla.App. 1963); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, on rehearing, 187 Kan. 186, 354 P.2d 670 (1960); 60 Colum.L.Rev. 1193 (1960); Annot. 99 A.L.R.2d 599 (1965). The nature and extent of the disclosure depends upon the medical problem as well as the patient. In some medical procedures the dangers are great; in others they are minimal.

See Atkins v. Humes, 110 So.2d 663, 81 A.L.R.2d 590 (Fla.1959). It has been suggested that some disclosures may so disturb the patient that they serve as hindrances to needed treatment. Patrick v. Sedwick, 391 P.2d 453 (Alaska 1964); Di Filippo v. Preston, 53 Del. 539 [3 Storey 539], 173 A.2d 333 (Sup.Ct.1961); Natanson v. Kline, supra; Lund, The Doctor, The Patient, and The Truth, 19 Tenn. L.Rev. 344 (1946); Smith, Therapeutic Privilege to Withhold Specific Diagnosis from Patient Sick with Serious or Fatal Illness, 19 Tenn.L. Rev. 349 (1946). Certain disclosures in some instances may even be bad medical practice. Aiken v. Clary, 396 S.W.2d 668, 674 (Mo.1965)."

■ It must also be considered at this point that the specially prepared consent form did relate some of the detailed information that plaintiffs complain of, i. e., "I realize that this device has been tested in the laboratory but has not been used to sustain a human being and that no assurance of success can be made." Texas law would require that a jury be instructed that Mr. Karp is charged with reading the consent even if in fact he did not. *See* Drummond v. Hodges, 417 S.W.2d 740, 747 (Tex.Civ. App., Dallas—1967, no writ) (plaintiff held to have knowledge even though he said he did not see anything on several papers); *see also* Slade v. Phelps, 446 S.W.2d 931 (Tex.Civ.App., Tyler—1969, no writ).

■ Under Texas law the jury would also have to have been instructed that Mrs. Karp's consent to the surgery was not required. Indeed, Mrs. Karp could not legally grant consent to surgery to be performed on her husband and, therefore, any information given to her or withheld from her could not have affected the informed consent of her husband. Gravis v. Physicians & Surgeons Hosp. of Alice, 427 S.W.2d 310 (Tex.1968).

[5] Accordingly, as to any issue of informed consent, a verdict must be directed for Dr. Cooley. Because there is

no duty upon a surgeon assisting the patient's chief surgeon to acquire a separate consent form and because the two consent forms signed by Mr. Karp cover Dr. Liotta, also, defendant Liotta would likewise have to receive a directed verdict in his favor.

■ With regard to the issue of negligence in Texas malpractice cases, the plaintiff has the burden of establishing such negligence by the use of expert medical testimony.

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries. Kaster v. Woodson, Tex.Civ.App., 123 S.W.2d 981 (er. ref.)" Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 782 (1949).

■ In establishing standards of medical criteria through expert testimony, the medical articles plaintiff introduced cannot be evidence of negligence or proximate cause.

"When a doctor testifies as an expert relative to injuries or diseases he may be asked to identify a given work as a standard authority on the subject involved; and if he so recognizes it, excerpts therefrom may be read not as original evidence but solely to discredit his testimony or to test its weight. Gulf, C. & S. F. Ry. Co. v. Farmer, 102 Tex. 235, 115 S.W. 260 . . . " *Bowles, supra*, at 783.

Plaintiff's counsel consistently argued at trial that one article by Dr. Cooley stated that aneurysms can burst and, therefore, this contradicted Dr. Cooley's testimony that he would never tell a patient his aneurysm would burst. Plaintiff argues that this would lend some weight to the jury deciding that the defendant had misinformed Mr. Karp or that he was negligent in diagnosing and treating Mr.

Karp. Dr. Cooley repeatedly testified that the articles referred to were not articles dealing with the same type of heart condition Mr. Karp suffered from and that the "burst aneurysm" account is credited to another doctor's statement not his [i. e., Dr. Cooley].

No medical expert opinion was given at trial to even suggest that Dr. Cooley or Dr. Liotta was negligent in any way in their diagnosis or surgical technique and that any such alleged negligence was the proximate cause of death. The Texas definition of negligence is failure to use ordinary care, which is use of that degree of care that medical doctors of ordinary knowledge and skill of the same school of practice of this or a similar community would use in the diagnosis, treatment, and surgery of patients under same or similar circumstances. Levermann v. Cartall, 393 S.W.2d 931 (Tex.Civ.App.—San Antonio 1965, N.R.E.).

Plaintiffs subpoenaed Dr. Michael DeBakey to testify. Defense counsel argued to the court that the previously publicized alleged friction between this witness and Dr. Cooley would be highly inflamatory and serve no purpose except to introduce issues into the case before the jury that were not properly before the court. Counsel took this position because Dr. DeBakey had indicated at his deposition that he would not give any medical opinion on the Karp case or willingly answer any hypothetical question developed from the Karp case facts. In order to have expert evidence admitted, if not on the expert's personal knowledge or observation, it must be given on hypothetical questions encompassing only factors which are in evidence. Powell v. Sanders, 324 S.W. 2d 587 (Tex.Civ.App.—Texarkana 1959, no writ); Drake v. Walls, 348 S.W.2d 62 (Tex.Civ.App.—Dallas 1961, writ ref'd, n. r. e.). Therefore, in order to minimize the increasing publicity of the trial, the court had Dr. DeBakey questioned in chambers with all counsel present and a court reporter. The record will amply reveal that Dr. DeBakey had not been employed to give any expert medical opinion; that he would not accept any employment in this case; that he had never examined Mr. Karp; that he had never seen Mr. Karp; that he would refuse to express any medical opinion concerning the treatment of Mr. Karp; that he would not express any medical opinion based upon hypothetical questions even if asked to do so; and in connection with the Cooley-Liotta mechanical heart used in Mr. Karp, he would refuse to express an in-court expert opinion concerning that device. Accordingly, this court concluded that Dr. DeBakey had no evidence of any probative value to present to the jury. Accordingly, to allow the plaintiffs' attorney to call Dr. De-Bakey as a witness before the jury under such circumstances would in all reasonable probability result in creating a highly prejudicial and inflamatory situation that would serve no useful purpose.

Dr. DeBakey was served with a subpoena with twenty dollars attached thereto by the plaintiffs' attorney. Dr. DeBakey appeared in court and at that time returned the twenty dollars to plaintiffs' attorney. People ex rel. Kraushaar Bros. & Co. v. Thorpe, 296 N.Y. 223, 72 N.E.2d 165 (1947). The various rules on compelling an expert to testify, in the absence of statutory provision, are affected by such factors as the nature of the action or proceeding in which the expert is called as a witness, by the nature or subject of the testimony, or by the status, relationship, or situation of the party by or against whom the testimony is sought. Thus, in some cases, the rule of compulsion has been limited to criminal prosecutions, and has been held not invocable by or on behalf of a private litigant.

In the absence of any statutory provision, this court weighed the factors set out above and determined that Dr. De-Bakey could not be compelled to testify. The following remarks from L'Etoile v. Director of Public Works, 89 R.I. 394, 153 A.2d 173 (1959) were instructive in making this determination:

"A different question, however, is presented on the issue of whether or not Lynch could be required to testify

as an expert when not engaged but merely subpoenaed by petitioners for that purpose. The petitioners admit that as an expert any testimony given by Lynch would have been based on his examination of their property made during and pursuant to his employment as an appraiser for the state. We are of the opinion that, on petitioners' subpoena, in the circumstances of the instant case the trial justice did not err in sustaining respondent's objection to the giving of testimony by Lynch as an expert. Pennsylvania Co. for Insurances on Lives and Granting Annuities v. City of Philadelphia, 262 Pa. 439, 105 A. 630, 2 A.L.R. 1573. See Cooper v. Norfolk Redevelopment & Housing Authority, 197 Va. 653, 90 S.E.2d 788, for a comprehensive discussion of the rule.

"The petitioners argue that exclusive of the ruling on Lynch's status as a witness it was error for the trial justice to inquire of the witness and make his decision in the absence of the jury. This argument is clearly without merit. If the ruling of the trial justice was correct, and we are of the opinion that it was, the inquiry by the court if made in the presence of the jury might well have been prejudicial to respondent. If the ruling had been otherwise the jury would have been recalled and the questioning of the witness by counsel for petitioners would have been conducted in their presence. The inquiry was preliminary procedure and the jury was properly excluded."

■ The defendants were also charged with fraudulent representations in connection with the written consent executed before Mr. Karp's operation. Fraudulent representations may assume three forms: (1) a false representation concerning a past or existing fact; (2) a promise made with a present intention not to perform; and (3) a statement of an opinion made with the intent to deceive. In order for a representation to be fraudulent, the jury would necessarily have had to find the following elements:

a. Defendants made the representation;

b. The representation was made concerning past or existing facts;

c. The representation was communicated to Haskell Karp in this case. In that connection such representation may be communicated through an individual or individuals who are not parties to the lawsuit;

d. The past or existing facts referred to in (b) above were material to the transaction and susceptible of knowledge on the part of defendants;

e. The representation was false at the time it was made;

f. The representation was made with the intent to induce Haskell Karp to do or refrain from doing some act (i. e., signing the consent);

g. The representation was relied upon by Haskell Karp in that Haskell Karp believed it to be true and was induced to act or refrain from acting thereby and Haskell Karp would not have acted upon or refrained from acting in the absence of such representation. It is not necessary that the defendants knew that such representation was false in order to find that the representation was fraudulent.

h. Haskell Karp suffered damage or injury as a result.

■ A promise may also amount to a fraudulent representation if the defendants made the promise with the intention, design, and purpose of deceiving and of not performing the promise. In addition, of course, each and all of the elements enumerated in paragraphs a through h, above, must be found by the jury. In the case of such a false promise, the law considers the state of mind of the defendants to constitute an existing fact.

■ A statement of opinion may also amount to a fraudulent representa-

tion. In order for a statement of opinion to amount to a fraudulent representation, the jury must find that the opinion was made with the intention, design, and purpose of deceiving and that the defendants did not believe the opinion so expressed. In addition, of course, each and all of the elements enumerated in paragraphs a through h, above, must be found by the jury. In the case of such a statement of opinion, the law considers the state of mind of defendants to constitute an existing fact.

 The evidence produced at trial was not of such quality and weight required by Boeing v. Shipman, *supra*, to raise a fact issue for the jury on fraudulent representations, promises, or opinions. Likewise, no proximate causation could have been found from any of the alleged representations and Mr. Karp's death.

"Whether the cause of action be for malpractice or fraud, the element of causation is essential. In the case of fraud, there must be a causal connection between the statement and the damages sustained. Allison v. Blewett, 348 S.W.2d 182 (Tex.Civ.App.); citing Hayden v. Dunlap, 84 S.W.2d 306 (Tex.Civ.App.); 37 C.J.S. Fraud § 42, p. 296; 24 Am.Jur., p. 48, Sec. 218; 13 A.L.R.2d 1; See also Netzel v. Todd, 24 Ohio App. 219, 157 N.E. 405 (Ohio)." Thomas v. Beckering, 391 S.W.2d 771 (Tex.Civ.App.—Tyler, 1965 ref. n. r. e.).

There was no proof showing that any statement, promise, or opinion made by Dr. Cooley resulted in Haskell Karp's death and, therefore, any injury to plaintiffs. The Fifth Circuit has thoroughly discussed the Texas concept of proximate cause in malpractice suits in the recent case of Bender v. Dingwerth, 425 F.2d 378, 381 (5th Cir. 1970):

"The plaintiff's burden is thus the affirmative one to establish that the doctor's negligence is one proximate cause of the injury. We have not been cited to nor have we found a single case in which the Texas courts have held that the plaintiff has the negative burden of disproving every other possible contributing cause of the injury. In approaching this very question the Texas Court of Civil Appeals recently remarked in Rose v. Friddell, Tex.Civ. App. 1967, 423 S.W.2d 658, 664, writ ref'd n. r. e.

'We recognize the rule which states that where there are two or more causes which might have produced the injury, for only one of which the defendant is responsible, and there is no evidence to show (sic) which cause the injury is actually attributable, a verdict should be directed for the defendant. Bowles v. Bourdon, supra. However, we do not believe the rule goes so far to require the plaintiff to prove causation by direct and positive evidence which excludes every other reasonable hypothesis. It is generally held that evidence which shows reasonable probability that defendant's negligence or want of skill was the proximate cause is sufficient to raise an issue for the jury. 13 A.L.R.2d 28.' "

 This same theory of proximate cause would have to have been applied to any issue of malpractice regarding the technical aspects of the surgeries themselves. The Texas law is clear that the court and jury must rely on expert testimony to determine negligence. "There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.

"The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury. Ewing v. Goode, 78 F. 442, 444 (C.C. Ohio, 1897); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949); Por-

ter v. Puryear, 153 Tex. 82, 262 S.W. 2d 933 (1954)." Hart v. Van Zandt, 399 S.W.2d 791 (Tex.1966).

In determining proximate cause, the proof must be beyond a showing of possibility that the injuries arose from the defendant's negligence or lack of skill, since a jury may not speculate as to the cause of the injury. *See* Hart v. Van Zandt, supra at 793. The Fifth Circuit articulated the confusion in this area which is set out here in a footnote.[1]

In summary, the requirement is to show through testimony of expert medical witnesses of the same school that the doctor's act did in fact cause injury not that it was a sole proximate cause. *See* Luna v. Nering, 426 F.2d 95 (5th Cir. 1970). Since there was no expert evidence that the doctors had performed any act negligently nor that any of their acts were a proximate cause of Mr. Karp's death, a directed verdict for both defendants must be entered. See Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949).

The attorneys for the defendants are directed to prepare a judgment in accordance wth this Order and Memorandum Opinion and have same approved by the attorney for the plaintiffs. Said judgment shall also recite the fact that Sam Calvin and St. Luke's Episcopal Hospital were dismissed from the suit before trial. Such judgment is to be presented to the court for approval and entry on or before two weeks from the date of this Order. This Order shall constitute this court's findings of fact and conclusions of law.

All costs of court are adjudged against plaintiffs.

---

1. "It is common for a court in stating the rules governing malpractice cases to assert that the plaintiff has not presented a sufficient case to go to the jury if several possible causes for the injury are shown, only one of which is attributable to the doctor, and the evidence does not establish that any of the alleged causes are actually responsible for the injury. Hart v. Van Zandt, *supra*; Bowles v. Bourdon, *supra*; Henderson v. Mason, Tex.Civ.App.1964, 386 S.W.2d 879; Lenger v. Physician's General Hospital, Tex. Civ.App.1969, 438 S.W.2d 408, writ granted; Ross v. Fridell, *supra*. The plaintiff's difficulty in these cases, however, is not a failure to show that the doctor's act was the *only* cause of the injury, but rather the failure to prove that there was any causal relationship at all between the doctor's act and the ensuing injury. This difficulty usually occurs because the plaintiff's expert medical witnesses are reluctant to state outright that the defendant's act or any other act was a cause of the resulting injury, preferring as medical men to state that such an act *might* have caused the injury. *See* Small, Gaffing at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation, 31 Texas L.Rev. 631 (1953). The result is that the plaintiff fails to prove what he must prove in any negligence case—that the act complained of was a proximate cause of the injury. The rule, therefore, is one demanding strict proof of causation in fact; it does *not* demand that the doctor's negligence be the *sole* or *only* proximate cause in order for the plaintiff to recover. It merely requires proof that the doctor's act is in fact *a* cause." Bender v. Dingwerth, *supra*.