of the corporate property for the protection of the creditors and benefit of the stockholders and order a dissolution of the corporation. Saltz v. Saltz Bros., 1936, 65 App.D.C. 393, 84 F.2d 246; Weiss v. Gordon, 1969, 32 A.D.2d 279, 301 N.Y.S.2d 839; Ward v. Colcord, 1969, 110 Ill.App.2d 68, 249 N.E.2d 137.

Since this case must be remanded to the district court for further consideration of a number of the issues involved, the court upon remand will have full opportunity to consider whether, in the light of the situation as it may then exist, it will be in the interest of justice to appoint a receiver and thereafter to take such further judicial action with respect to Desco and its property as may best be calculated to resolve the impasse between the stockholders of the corporation.

Paragraph 3 of the judgment of the district court will be affirmed. Paragraph 4 and the first clause of paragraph 5 of the judgment will be reversed. Paragraphs 1, 2, 6 and 7 and the last clause of paragraph 5 of the judgment will be vacated and the cause will be remanded to the district court for further proceedings not inconsistent with the opinion of this court.

**Shirley KARP, Individually, etc., et al., Plaintiffs-Appellants,**

v.

**Denton A. COOLEY and Domingo S. Liotta, Defendants-Appellees.**

No. 73-2146.

United States Court of Appeals, Fifth Circuit.

April 26, 1974.

Rehearing and Rehearing En Banc Denied June 11, 1974.

John H. Holloway, Houston, Tex., for plaintiffs-appellants.

Thomas B. Weatherly, Paul E. Stallings, Houston, Tex., for Denton A. Cooley.

A. J. Watkins, Houston, Tex., for Domingo S. Liotta.

Before BELL, THORNBERRY and DYER, Circuit Judges.

BELL, Circuit Judge:

Medical history was made . in 1969 when Dr. Denton A. Cooley, a thoracic surgeon, implanted the first totally mechanical heart in 47-year-old Haskell Karp. This threshold orthotopic cardiac prosthesis [1] also spawned this medical malpractice suit by Mr. Karp's wife, individually and as executrix of Mr. Karp's estate, and his children, for the patient's wrongful death. Grounded on diversity jurisdiction, and thus Texas substantive law, novel questions concerning experimentation, as well as issues of informed consent, fraud, and negligence are presented. After nine days of trial and numerous ancillary proceedings outside the jury's presence, the district court in a carefully considered opinion directed a verdict for the defendant-appellees, Dr. Denton A. Cooley and Dr. Domingo S. Liotta. Karp v. Cooley, S. D.Tex., 1972, 349 F.Supp. 827. For reasons stated herein, we affirm.

## ASSIGNMENTS OF ERROR

There are eleven asserted errors. In assignments one through four, the claim is made that the district court erred in directing a verdict for defendants on appellants' causes of action based on fraud and a lack of informed consent; point five objects to the directed verdict on appellants' claim of fraud, negligence, and gross negligence in the performance of the various surgical procedures; point six is a claim of negligence based on "human experimentation;" point seven claims fraud and negligence in connection with the heart transplant; point eight assigns error in the exclusion of certain records of Baylor Medical School; points nine and ten are objections to the exclusion of Dr. Michael DeBakey's testimony and to alleged in-chambers judicial "coercion;" and point eleven assigns error for the exclusion of a motion picture film of the Karp operation. Because of the nature of the questions presented here, we have outlined

1. The mechanical heart implant was actually the second stage of a three stage procedure. On April 4, 1969, Dr. Cooley first attempted a ventriculoplasty, or as sometimes termed a wedge excision, or wedge resection. That proved unsuccessful, and it was then that the mechanical heart was implanted in Mr. Karp, where it sustained Mr. Karp for approximately sixty-four hours. A donor heart was then available, and the transplant operation was performed on the morning of April 7, 1969. Mr. Karp died at 4:10 p. m., April 8, 1969, some thirty-two hours after the transplant surgery.

the evidence presented at the trial in some detail.

## FACTS

There is no dispute that prior to entering St. Luke's Episcopal Hospital in Houston on March 5, 1969, Haskell Karp had a long and difficult ten-year history of cardiac problems.[2] He suffered a serious heart attack in 1959 and was hospitalized approximately two months because of diffuse anterior myocardial infarction. He had incurred four heart attacks, thirteen cardiac hospitalizations and considerable medical care culminating in the insertion of an electronic demand pacemaker in May, 1968. Subsequent hospitalization in September and October, 1968 occurred, and finally the decision was made to seek the assistance of Dr. Cooley. Mrs. Karp telephoned Dr. Cooley on March 3, 1969, and it was agreed Mr. Karp would be in Houston by Wednesday, March 5.

## MRS. KARP'S TESTIMONY

 Mrs. Karp's testimony in relevant part was that at the time of his hospital admission March 5, Mr. Karp's physical condition was "as normal as any man in the courtroom" and that he was in no pain or discomfort. She testified Dr. Homer L. Beazley, a cardiologist, examined Mr. Karp on March 6 and on a daily basis after that. She said Dr. Cooley first saw Haskell Karp on Tuesday, March 11. She said Dr. Cooley recommended a heart transplant, but that Mr. Karp rejected this suggestion. She said Dr. Cooley next saw Mr. Karp about a week later when he began to talk about a "wedge procedure" and an aneurysm.[3] She then testified that she next saw Dr. Cooley the day before Mr. Karp's surgery on April 3, 1969, although she admitted that Dr. Cooley had seen Mr. Karp the night before on April 2 when she was not present. Mrs. Karp testified Dr. Cooley came into the hospital room about 6:30 or 7:00 p. m. on April 3. As Mrs. Karp described this meeting:

"When Dr. Cooley came in, he said, 'I have a paper here for you to sign for Mr. Karp's surgery,'[4] and I looked at

2. A detailed history is contained in the district court opinion, 349 F.Supp. at 829. This is drawn from the history and physical examination by Dr. A. J. Levine, Defendants' Exhibit No. 5. Mrs. Karp also detailed Mr. Karp's medical history in her testimony.

3. Mrs. Karp said Dr. Cooley told Mr. Karp and her that an aneurysm
". . . is like a ballooning out of a section of this [tire tube]. It's like a weak wall. And when you put pressure on it or drive it, it could break open."

4. This consent form was prepared by Dr. Cooley and Mr. Henry Reinhard, Assistant Administrator of St. Luke's Episcopal Hospital, on April 3 especially for the Karp operation. While there is a conflict in the testimony between Mrs. Krap, Dr. Cooley, and Mr. Reinhard as to *when* Mr. Karp signed the form, there is no dispute that Mr. Karp signed it, and that both Mr. and Mrs. Karp's signatures were verified consequently by Mr. Reinhard. The consent form reads as follows:
CONSENT TO OPERATION
April 3, 1969
1. I, Haskell Carp, request and authorize Dr. Denton A. Cooley and such other surgeons as he may designate to perform upon me, in St. Luke's Episcopal Hospital of Houston, Texas, cardiac surgery for advanced cardiac decompensation and myocardial insufficiency as a result of numerous coronary occlusions. The risk of this surgery has been explained to me. In the event cardiac function cannot be restored by excision of destroyed heart muscle and plastic reconstruction of the ventricle and death seems imminent, I authorize Dr. Cooley and his staff to remove my diseased heart and insert a mechanical cardiac substitute. I understand that this mechanical device will not be permanent and ultimately will require replacement by a heart transplant. I realize that this device has been tested in the laboratory but has not been used to sustain a human being and that no assurance of success can be made. I expect the surgeons to exercise every effort to preserve my life through any of these means. No assurance has been made by anyone as to the results that may be obtained.
\* \* \* \* \*
Signature s/ Haskell Karp
Haskell Karp.
WITNESSES:
s/ Mrs. Haskell Karp
Mrs. Haskell Karp (wife)
s/ Henry C. Reinhard, Jr.
Henry C. Reinhard, Jr.

him, and said, 'Why do you want to operate,' you know, 'tomorrow after keeping us here so long? Can you tell me about it?'

"And he said, 'Mr. Karp has taken a sudden turn for the worse. His aneurysm is about to burst. If we wait too long, we may not be able to get into his heart to repair anything.'

"He says, 'I still don't know whether we can even wait till tomorrow.'

"I said to him, 'You once told me, Dr. Cooley, that . . . you thought he needed a transplant.' I said, 'Do you still think that's the answer.'

"And Dr. Cooley said to me, 'Mrs. Karp, there is a donor heart that will be available and that we will use if there's that need for it.' . . .

"He says, 'Will you sign this now?' And I looked at my husband, and I guess he was in tears because I was shaking. And Dr. Cooley said to me, 'don't worry about the shock element to your husband because I told him exactly what I told you now last night.'

"So then my husband said, 'Honey, he told me this last night.' He said, 'Go ahead. We'll sign the agreement.'

"And that's what happened. My husband signed it—. . . . Then he gave it to me to sign. And I says, 'I got to read it first.'

"And I started to go down it and I was glancing at the—it was all too bewildering and all of a sudden I came across some sort of a mechanical device, and I said, 'Dr. Cooley, what's this thing here that you have?'

"I said, 'what's mechanical device?'

"And he said, 'well you know, Mrs. Karp, when we operate on a heart we have to take the heart out of the body. So what we do is use what's commonly

known as a heart lung machine and we attach the pipes from the machine to the different arteries that they sever to take the heart out. And this here keeps the flow of blood going through the body and the oxygen so that there will not be any damage to the body.'

"So he says the reason that he put that into the consent was because the one that they had in the operating room, I believe he said, worked for a matter of maybe two hours or something and this here one was a new model and it was proven in the laboratory, but he [sic] hasn't been used on a human being yet. But that this here should sustain him if he should die on the table. He says it would sustain him for at least thirty minutes in order to get the donor heart into my husband's body."

Mrs. Karp also testified that Dr. Cooley did not state that the device was any different from the heart-lung device ordinarily used for open heart surgery, stating that it was a "newer model" that had not been used before. She said Dr. Cooley told her there was a donor heart available in a nearby hospital, and that the mechanical device would be used for only 30 minutes while the donor was being prepared. Mrs. Karp said Mr. Reinhard came to the room early the next morning to verify the signatures. She also testified that Mr. Karp at the time of the April 3 meeting with Dr. Cooley was as normal as when he entered the hospital, that his physical appearance was the same and there was no appearance of pain; and that Mr. Karp was able to walk around the hospital even the morning of the operation. She said both Dr. Beazley and Dr. Cooley had said the wedge excision had a 70 per cent chance of success, and that Dr. Cooley had said that in his own personal experience he had less than a five per

---

\* \* \* \* \*

The district court opinion also quotes from the standard consent form signed by Haskell Karp at the time he was admitted to St. Luke's on March 5, but this has no real relevance on informed consent. Luna v. Nering, 5 Cir., 1970, 426 F.2d 95, 98, 99 (Texas law); see also Waltz & Scheuneman, 1970, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, n. 60.

cent chance of failure and that it "seemed like it hardly ever failed."

## DR. COOLEY'S TESTIMONY

Dr. Cooley testified that he first saw Mr. Karp on or about March 5, 1969 and that he recommended a heart transplant which Mr. Karp rejected, preferring "some alternative procedure." Dr. Cooley said tests then showed Mr. Karp had triple vessel disease where all three coronary arteries were occluded. He said electrocardiograms showed evidence of extensive scarring and damage and that his chest x-rays showed enormous cardiac enlargement. In addition, said Dr. Cooley, he had a pacemaker which was about to fail. Dr. Cooley said he estimated that Karp's chances of dying in the operating room as a result of the wedge procedure were approximately thirty per cent. He testified that as some three weeks passed, Mr. Karp grew increasingly impatient waiting for a donor's availability in the event the wedge excision failed. Dr. Cooley said it was the custom of medical doctors in the community to advise a patient of risks of surgery "within certain boundaries. . . . but not every contingency can be explained to a layman about the threat and the risk of open heart surgery or the type of device which we are using, many of which are being used for the first time in a patient." About a week before the operation of April 4, 1969, Dr. Cooley said he began to discuss with Mr. Karp the possibility of another alternative "which I did not think was proper when he initially came to the hospital."

"I told him we had no heart donor available, had no prospect of one . . . I told him that there was a possibility that we had a device which would sustain his life in the event that he would die on the operating table. We had a device which would sustain his life, hopefully, until we could get a suitable donor. I had told him that I did not know whether it would take a matter of hours or days, weeks, or maybe not at all, but it would sustain his life and give us an other possibility of salvaging him through heart transplantation."

Dr. Cooley said he did not recall who was present when these discussions began. Dr. Cooley described his discussion of this device:

"I told him that it was a heart pump similar to the one that we used in open-heart surgery; that it was a reciprocating-type pump with the membrane, in which the pumping element never became in contact with the bloodstream; that it was designed in such a manner that it would not damage the bloodstream or it would cause minimal damage to the bloodstream; that it would be placed in his body to take over the function of the dead heart and to propel blood throughout his body during this interim until we could have a heart transplant. [Tr. 261]. . . . I told him this device had not been used in human beings; that it had been used in the laboratory; that we had been able to sustain the circulation in calves and that it had not been used in human beings. It had been used on the bench in what we call in vitro experiments, in vitro as opposed to in vivo. In vivo means using it in live or experimental animals. In vitro means using it in some type of testing device where you test the hydraulic factors concerned with the pump. I told him it had been tested in the laboratory, it had not been used in a human being, but I was confident that it would support his circulation. . . . I told him that we had been successful in keeping an animal alive for more than forty hours with the device, but that this was a calf. It was a 300-pound animal in which the demands on the pump were far greater than would be in the human body, and that I was reasonably confident that this device would sustain his life until we could get a heart transplant. But no guarantees were made at all."

Dr. Cooley admitted he and Mr. Karp did not discuss the number of animals in which the device had been tested, nor

whether the animals sustained damage to their bodies by the use of this pump.

Asked by appellants' counsel whether he described it as a heart-lung pump similar to that used in other open heart surgeries, Dr. Cooley said, "I told him it was a pump. I didn't tell him it was a lung. I told him it was an artificial heart, that it was a pump which would replace temporarily the heart."

Dr. Cooley said he next discussed the operation with Mr. Karp the evening of April 2, 1969 at approximately 10:30 p. m. Dr. Cooley said he assured himself that Mr. Karp understood the gravity of his personal situation and the nature of the operation to be performed. Dr. Cooley said he does not recall whether Mrs. Karp was present during these conversations, and added that he was not present when Mrs. Karp signed the consent form and that he did not witness *the signing of the consent form.*

### DR. HOMER L. BEAZLEY

While at St. Luke's Hospital as Dr. Cooley's patient, Haskell Karp was examined and treated on numerous occasions by Dr. Homer L. Beazley, a cardiologist. Based upon his examination of Mr. Karp, Dr. Beazley expressed the firm belief that Mr. Karp was "totally disabled", would be unable to return to his employment without surgery, and was a suitable candidate for wedge resection surgery.[5] Dr. Beazley had generally discussed various surgical procedures with Mr. Karp including the possibility of a heart transplant, but Mr. Karp desired to have the wedge resection or excision of diseased heart muscle attempted as the initial procedure.

### RABBI NATHAN WITKIN

On April 2, or two days prior to surgery, Mr. Karp sent for Rabbi Nathan Witkin, who had counseled with Mr. and Mrs. Karp virtually every day since the day Mr. Karp entered St. Luke's. According to Rabbi Witkin's testimony, Mr. Karp told the Rabbi that he was a very sick man, his only hope was surgery, and the odds of his surviving surgery were not favorable. On direct examination Rabbi Witkin said Mr. Karp told him the chances of surviving surgery were 70 per cent against him. He said that if he did not survive surgery a mechanical heart would be implanted in him. Rabbi Witkin said Mr. Karp told him that while he had originally opposed a transplant, he now agreed that if his condition became so serious on the operating table with the possibility of death that he would accept a mechanical heart with the prospect of a subsequent transplant. He said that Mrs. Karp never led him to believe that she had any contrary understanding. The Rabbi said Mr. Karp was "proud" he would be the first human to "experience such a device." On cross-examination the Rabbi corrected himself to remember that Mr. Karp had told him that the odds were 80–20 against him rather than 70–30. The Rabbi said that he at no time found Mr. Karp upset and that Mrs. Karp was calm at all times.

### MR. HENRY REINHARD

Mr. Henry Reinhard, Assistant Administrator of St. Luke's Hospital, said that he first met Haskell Karp on Thursday April 3 in the mid-afternoon. He said no one else was then present and the purpose of his visit was to attest to Mr. Karp's signature on the consent form and review its contents with him. Asked whether Mr. Karp had already signed the form when he went to Mr. Karp's room Mr. Reinhard said, "As I recall, he had, yes, sir." Mr. Reinhard also said Mrs. Karp's signature was already on the consent form at that time. After having been prepared in his office Thursday morning, Mr. Reinhard said he delivered the consent form to Dr. Cooley's office late that morning. He

---

5. As is discussed *infra,* appellants sought to argue that negligence was demonstrated on the informed consent issue from Dr. Cooley's not telling Mr. Karp of a notation made by Dr. Beazley on March 6, 1969 that said, "I am not completely sold that he is a candidate for surgery."

said that in the early afternoon on April 3 Dr. Cooley got word to him that Mr. Karp had signed it and that the doctor wanted Mr. Reinhard to review it.

Dr. Keats, the anesthesiologist, said that he talked with both Mr. and Mrs. Karp the morning of the operation. Dr. Keats testified that he made inquiry whether Mr. Karp understood the nature of the surgical procedure and whether it had been explained to him to his satisfaction and offered to answer any questions. According to Dr. Keats, Mr. Karp had no questions.

## THE OPERATION

According to the anesthesia record (Plaintiffs' Exhibit I), Mr. Karp was brought into the operating room at about 1:15 p.m. When Dr. Keats saw Mr. Karp at that time he believed Mr. Karp's death to be imminent. Dr. Keats said Mr. Karp was in great distress; he was having difficulty breathing, shortness of breath and he was pale and sweating. Dr. Keats said he hurriedly got Mr. Karp on the operating table, started giving him oxygen, and put him to sleep as rapidly as possible so that they could put a tube in his windpipe to assist his breathing. Dr. Keats then sent word to Dr. Cooley that they "had better go ahead with the operation as expeditiously as possible, otherwise the patient may not last long enough to have the operation." Dr. Cooley testified that when Mr. Karp was brought to the surgical hallway before the operation he was completing another patient's open heart surgery. He says he was told by someone that Mr. Karp was at that time near death and he proceeded to complete the other surgery which he said took about 20 minutes. Dr. Cooley says Mr. Karp was near death when he entered the operating room, "mottled and blue." He said he felt Mr. Karp was "virtually moribund" at that time.

The operation was then begun with Dr. Cooley as chief surgeon, Dr. Liotta as first assistant, Dr. Grady Hallman as second assistant, and Dr. Keats as anesthesiologist. Dr. Cooley testified that when he entered the operating room Karp was being given oxygen by mask. He said that he opened the pericardium and that as a result of very feeble heart action the heart pump was started as quickly as possible. Dr. Keats remembers that as Mr. Karp's heart became visible "it was a very large heart that filled the entire surgical field." Dr. Cooley said that the heart was functioning very feebly, was virtually noncontractile and could not support Mr. Karp. After Mr. Karp had been on the heart-lung or heart oxygenator a sufficient time to get his heart going again an incision was made in the left ventricle. Dr. Cooley said that Mr. Karp had scar tissue circumferentially around the inside of his left ventricle, that his entire interventricular septum was one solid piece of scar tissue, the anterior ventricle was almost completely displaced by scar tissue, and there was an aneurysm on the posterior aspect of the ventricle. Dr. Cooley said that the only normal appearing muscle was in the papillary muscles of the mitral valve, but they have nothing to do with the left ventricular output.

Although Dr. Cooley said the situation was then "virtually hopeless", he began to do what he could with the resection procedure.[6] He excised the most severely damaged part of the ventricular myocardium in his repair of the left ventricle. Because of the extensive scarring it was necessary to excise part of the right ventricle. In completing this complicated repair it was then necessary to sew the partition back to the right ventricle, and sew the left ventricle back to them. Dr. Cooley said that Mr. Karp did not have an anterior aneurysm but that the

6. Dr. Cooley states the wedge resection would have been beneficial, "but at the time of operation, we discovered a situation for which wedge resection could not be beneficial. But since we were under this obliga-tion, I felt a moral obligation to try. We tried the wedge procedure and it failed. He ostensibly died on the operating table, so we proceeded with the alternate."

anterior myocardium was diffusely dilated. He added that it was very difficult to differentiate between a dilated scarred heart and an aneurysm. He described the nonfunctioning large area on the left ventricle as having a paradoxical motion and a ballooning out effect. He compared the size of the balloon to a cantaloupe. He said there was no threat of break or rupture in lesions like this; that he had never seen one rupture; and that he never told a patient a ventricular aneurysm would burst.

It is to be noted here that although Mrs. Karp testified her husband had appeared normal on the day of the surgery, there is no lay or expert testimony other than that Mr. Karp was near death at the time of the operation.

According to Dr. Hallman, the repair described above was done in the manner that cardiovascular surgeons normally go about performing this operation. However, Dr. Hallman said that due to the extensive scarring of the heart, there simply was not sufficient healthy heart muscle remaining to form an efficient pump to support Mr. Karp's life. Dr. Hallman, Dr. Keats and Dr. Cooley all testified that at this point, that is after the attempted resection, Mr. Karp was again faced with imminent death.

Dr. Cooley said that it took about 20 minutes to make the resection repair.[7] He said that after the repair the clamp was taken off the ascending aorta to attempt to restart the myocardium. He stated that there was fibrillation and that he attempted an electrical countershock at least once.[8] He stated that there was a sinus type or nodal rhythm at that point but that the rhythm

contraction was too weak to support life due to the fact that there simply was too much scar tissue in the heart. Dr. Hallman testified that some thirty minutes elapsed between the end of the repair and the decision to remove the heart. Mr. Karp's heart was then removed and the mechanical device was inserted. Dr. Cooley said that the mechanical heart functioned very well and Mr. Karp responded to stimulation within 15 or 20 minutes after the incision was closed. His blood pressure was well sustained according to Dr. Cooley and he showed signs of cerebral activity. Dr. Keats said that Mr. Karp was amazingly well following the operation, that the records reflect that he was responding reasonably to commands within 20 minutes postoperatively. Dr. Keats testified that the endocracheal tube was removed about 1:20 a. m., and that he saw Mr. Karp some time the next morning at which time he was responsive and could communicate.

After the mechanical heart had been inserted, Dr. Cooley said he went to Mrs. Karp and told her that the wedge procedure had been unsuccessful; that he had proceeded with the use of the mechanical device and that they were going to try to get a donor. The transplant operation was performed on the morning of April 7, 1969, approximately 64 hours after the mechanical device had been implanted in Mr. Karp. He died the next day, April 8, 1969, some 32 hours after the transplant surgery.

### DR. JOHN D. MILAM

Dr. John D. Milam, a pathologist who participated in both the pathological ex-

---

7. Dr. Keats testified from the anesthesiology record that the wedge excision took seven minutes.

8. Dr. Cooley said the electrical shock stopped the fibrillation, a sinus type of a nodal rhythm then began, but the rhythm contraction was too weak to support Mr. Karp's life. Dr. Keats said he believed more than one shock attempt was made, basing this on both memory and the anesthetic record that three attempts were made

during this time period immediately after the wedge excision to take Karp off the heart-lung by-pass. Dr. Keats confirmed that the shock restarted the beat, but not the heart's pumping action. Apparently one of the plaintiffs' theories of negligence, and also asserted as one of the circumstantial factors supporting the experimentation count, was an alleged lack of medical effort on Dr. Cooley's part to revive Mr. Karp after the wedge resection. Appellants' theory has no evidentiary foundation.

amination of Mr. Karp's diseased heart and the autopsy performed on Mr. Karp, testified that in reasonable medical probability the immediate cause of Mr. Karp's death was pneumonia, and the secondary or contributing factor was renal failure. In testifying about the "cause of the causes", Dr. Milam said that the cause of the pneumonia was a germ or bacteria called pseudomonas, which he said was a type of pneumonia that has shown up in other patients undergoing heart transplants as well as non-transplant and non-cardiovascular patients. He said that the cause of the renal dysfunction could have been either a state of shock as a result of the surgery, an infectious process such as pneumonia, the use of the heart-lung machine, or the mechanical heart. Dr. Milam said that because of the rarity of hemoglobin casts in Mr. Karp's kidney tubules, the mechanical heart and heart-lung bypass were less likely causes of the renal shutdown than shock or pneumonia. Based on his examination of Mr. Karp's heart, Dr. Milam said that Mr. Karp would have died in a few hours.

## DR. DONALD ROCHELLE

Dr. Donald Rochelle, a cardiologist who first examined Karp some two hours after the transplant, and who also observed the autopsy, said at that initial examination Karp was critically ill with two major problems, pneumonia and renal failure. Dr. Rochelle also expressed the opinion the chief or primary cause of Mr. Karp's death was pneumonia, and he felt that the renal problem was a contributing or weakening factor. He said that it was "possible" that the renal failure was a result of the first surgery while Karp was on the heart-lung machine, or that the mechanical heart could have been a contributing factor. Asked how long damage to the red blood cells could exist before it became irreversible, Dr. Rochelle said it could exist for a long time—10 days to a month and still become reversible. Dr. Rochelle said there was some damage to the blood

caused by the mechanical device. He said the record indicated the rate of blood cell destruction was measured frequently while the mechanical heart was in place, and the longer the mechanical device was in Karp, the rate and severity of the blood cell destruction diminished as the innerlining of the mechanical device became coated with a substance mimicking the interior of blood vessels and the heart. He said that "some" of the renal shutdown was caused by damage to the blood.

## THE PROSTHESIS

The record is virtually undisputed that the mechanical heart inserted in Haskell Karp was prepared by Dr. Liotta at the Baylor laboratories. Ms. Susan Anderson, a lab technician at Baylor, described her work on this heart pursuant to Dr. Liotta's instructions. She testified that they had been making this type of pump in the lab for some six to eight months. She was not sure whether she actually made the same pump used in Haskell Karp but said it was the same type. She said several of the pumps of different sizes were made at Dr. Liotta's request one month before the Karp surgery. She said that Dr. Liotta had the composition of the mechanical device changed some three or four weeks before the Karp surgery, such as smoothing ragged inflow edges. She said that these pumps were the same type that were used in the Baylor experiments although the valves were tied more securely and they had a velour lining.

Asked by plaintiffs' counsel whether Dr. Michael DeBakey was developing a similar type pump, Dr. Cooley said Dr. DeBakey had used a univentricular pump that Dr. Cooley said carried only about 30 per cent of the circulation. Dr. Cooley said that he and Dr. Liotta had designed the biventricular pump used in Mr. Karp at St. Luke's. Dr. Cooley said that the mechanical device was tested in seven calves in the Baylor labs as well as in vitro [lab] experiments. Dr. Cooley said that he could

not testify as to some of the details of these last three calf experiments because his notes were confiscated by Dr. De-Bakey, but said that the results of all three experiments were encouraging. He said the third calf experiment was the most gratifying of all because "it demonstrated conclusively that the device was efficient and deserved application in humans." Dr. Cooley said he did not recall what either the first or second calf died from, how long they lived, whether there was urinary output, or whether the calves were able to eat or stand up. He said he recalled there was some urine output in the third calf, although it was low.

We first affirm the district court's directed verdict for defendants on the issues of informed consent and fraud.

## INFORMED CONSENT

▮ Suits charging failure by a physician adequately to disclose the risks and alternatives of proposed treatment are not innovations in American law. They date back a good half-century,[9] and in the last decade have increased in number. The courts and commentators [10] have not been in agreement on the substantive requirements or the nature of the proof required,[11] but the Texas requirements are reasonably well-settled and stringent.

▮ The root premise jurisprudentially is that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body. . . ."[12] Physicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. Scott v. Wilson, Tex.Civ. App.1965, 396 S.W.2d 532, aff'd, Wilson v. Scott, Tex.1967, 412 S.W.2d 299, 301. True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgably the options available and the risks attendant upon each.[13] From these general principles, however, the focus in each individual case must necessarily relate back to

9. *See, e. g.,* Hunter v. Burroughs, 1918, 123 Va. 113, 96 S.E. 360 (dictum), where the court affirmed a judgment for plaintiff based on a finding of sufficient evidence to support the finding of negligent treatment without having to rule upon the issue of informed consent; Theodore v. Ellis, 1917, 141 La. 709, 75 So. 655. The modern development is generally recognized as beginning with Natanson v. Kline, 1960, 186 Kan. 393, 350 P.2d 1093, on rehearing, 187 Kan. 186, 354 P.2d 670. *See* Waltz & Scheuneman, 1970, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628, 635–36, n. 25, for a collection of cases.

10. *E. g.,* Note, Informed Consent—A Proposed Standard for Medical Disclosure, 1973, 48 N.Y.U.L.Rev. 548; Note, Informed Consent as a Theory of Medical Liability, 1970 Wisc.L.Rev. 879; Note, Failure to Inform as Medical Practice, 1970, 23 Vand.L.Rev. 754. For an exhaustive compilation of commentary on the doctrine of informed consent, see Waltz & Scheuneman, 1970, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, n. 1.

11. As discussed *infra,* the majority rule, to which Texas subscribes, compels a physician to disclose facts which a reasonable medical practitioner in a similar community and of the same school of medical thought would have disclosed to his patient regarding the proposed treatment. Since it is said only doctors are competent to testify about medical customs, majority rule jurisdictions require the plaintiff to introduce expert testimony to establish the doctor's duty to disclose. *See* Note, Informed Consent—A Proposed Standard for Medical Disclosure, *supra,* note (10), 48 N.Y.U.L.Rev. at 552–53.

A "minority" rule has developed requiring disclosure of all "material" information which a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. *See, e. g.,* Canterbury v. Spence, 1972, 150 U.S.App.D.C. 263, 464 F.2d 772; Riedinger v. Colburn, D.Idaho, 1973, 361 F.Supp. 1073 (Idaho law); Cobbs v. Grant, 1972, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1.

12. Schloendorff v. Society of New York Hosp., 1914, 211 N.Y. 125, 219, 105 N.E. 92, 93 (Cardozo). See W. Prosser, Law of Torts, § 18 and § 32, at 105–06 and 165–66 (4th ed. 1971).

13. See Canterbury v. Spence, *supra* note (11), 464 F.2d at 780 n.13 (and cases cited).

what the physician said or failed to say and what the law requires him to say.[14]

The Texas standard against which a physician's disclosure or lack of disclosure is tested is a medical one which must be proved by expert medical evidence of what a reasonable practitioner of the same school of practice and the same or similar locality would have advised a patient under similar circumstances. Wilson v. Scott, *supra*, 412 S. W.2d at 301–304. Quoting from and with approval of Aiken v. Clary, Mo. 1965, 396 S.W.2d 668, 674, the Texas Supreme Court said in *Wilson*:

"The question to be determined by the jury is whether the defendant doctor in that particular situation failed to adhere to a standard of reasonable care. These are not matters of common knowledge or within the experience of laymen. Expert medical evidence thereon is just as necessary as is such testimony on the correctness of the handling in cases involving surgery or treatment . . . 'Without the aid of expert medical testimony . . . a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances' . . . The question is not what, regarding the risks involved, the juror would relate to the patient under the same or similar circumstances, or even what a reasonable man would relate, but what a reasonable *medical practitioner* would do. Such practitioner would consider the state of the patient's health, the condition of his heart and nervous system,

his mental state, and would take into account, among other things, whether the risks involved were remote possibilities or something which occurred with some sort of frequency or regularity. This determination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed."

As we understand appellants' contention, it is that Mr. Karp was not told about the number of animals tested or the results of those tests; that he was not told there was a chance of permanent injury to his body by the mechanical heart, that complete renal shutdown could result from the use of the prosthesis, that the device was "completely experimental;" and that Dr. Cooley failed to tell Mr. Karp that Dr. Beazley had said Mr. Karp was not a suitable candidate for surgery. Nine physicians testified, but none suggested a standard of disclosure required by Texas law under these circumstances. Appellants argue Dr. Cooley himself set the standard requiring the disclosure of Dr. Beazley's evaluation. Texas law does permit the defendant doctor to establish the standard of disclosure, Wilson v. Scott, *supra*, 412 S.W.2d at 303, but Dr. Cooley's testimony says no more than that what is a reasonable medical practice is a question of medical judgment. Dr. Cooley's admitted failure to tell Mr. Karp of Dr. Beazley's March 6 notation is of no import; Dr. Leachman testified he did not think the notation made any difference; the March 6 notation, made during the course of an initial evaluation, was in Dr. Beazley's view not a medical opinion but a reservation about the psychologi-

14. *Id.* at 780 n.15. The doctrinal label "informed consent" has been criticized for its emphasis on the patient's understanding and consent rather than the central issue, the physician's duty to inform the patient of the risks and consequences involved in the contemplated procedure. This has been said to result from the doctrine's original development from a battery theory rather than the more currently accepted theory of negligence. *See* Scott v. Wilson, Tex.Civ.App. 1965, 396 S.W.2d 532 (battery theory), aff'd, Wilson v. Scott, Tex.1967, 412 S.W.2d 299 (negligence theory). *See also* Note, Informed Consent as a Theory of Medical Liability, *supra*, note (10), 1970 Wisc.L.Rev. at 887 and n.55.

cal or emotional acceptance of less than a perfect result. See note 5 *supra*.

█ What is missing from the evidence presented is the requisite expert testimony as to *what* risks under these circumstances a physician should disclose. Anderson v. Hooker, Tex.Civ. App. (writ ref'd n. r. e.), 1967, 420 S. W.2d 235.

█ Appellants' principal reliance for both the informed consent and fraud issues is the testimony of Mrs. Karp of what she was and was not told. Consent of the wife for the husband's operation has no significance under Texas law unless the person is legally authorized to give such consent, a proposition having no support in the record. The relationship of husband and wife does not itself create such a legal authorization. Gravis v. Physicians and Surgeons Hospital, Tex., 1968, 427 S.W.2d 310, 311. What is significant then is what Mr. Karp was told, and Mrs. Karp's testimony is relevant only to the extent that it evidences what Mr. Karp was told when she was present. Dr. Cooley's undisputed testimony is that he began discussing with Mr. Karp the proposed wedge excision and the alternative procedure of a mechanical heart as a stopgap to a transplant about a week before the April 4 operation. He said he next talked with Mr. Karp the evening of April 2. The consent form was prepared on April 3 and although there is a dispute as to *when* it was signed, there is no question it was signed by Mr. Karp. Thus it was against the backdrop of at least two conversations with Dr. Cooley, at which Mrs. Karp was not present, that Mr. Karp was presented and signed the consent document. The consent form is consistent with Dr. Cooley's testimony of what he told Mr. Karp. Although not necessarily conclusive, what Haskell Karp consented to and was told is best evidenced by this document. See Drummond v. Hodges, Tex.Civ.App. (no writ), 1967, 417 S.W.

2d 740; Goodnight v. Phillips, Tex.Civ. App. (writ ref'd n. r. e.), 1970, 458 S. W.2d 196, 200. It is of considerable import that each step of the three-stage operation, objected to due to an alleged lack of informed consent, was specifically set out in the consent document signed by the patient. See the text of the consent document note (4) *supra*.

Appellants have not introduced evidence required by Texas law to show a lack of Karp's informed consent or of breach of Dr. Cooley's duty to adequately apprise Karp of the nature and risks of the operation that warrant, when tested by Boeing v. Shipman, 5 Cir. (en banc), 1965, 411 F.2d 365, 374, submission of this issue to the jury.

█ A second important reason to affirm the directed verdict on the issue of informed consent here is the absence of substantial evidence on the requisite causal connection between the lack of informed consent and harm. Appellants assert that in Martisek v. Ainsworth, Tex.Civ.App. (writ ref'd n. r. e.), 1970, 459 S.W.2d 679, Texas, "adopted the theory that 'general experience and common sense' enable laymen to determine the causal relationship between the failure to advise a patient of a risk involved in medical treatment and injury resulting from the failure to be informed." *Martisek* was subsequently distinguished on its facts [15] in Conrey v. McGehee, Tex.Civ.App. (writ ref'd n. r. e.), 1971, 473 S.W.2d 617, where the court said that while laymen could arguably ascertain a causal relationship between a failure to warn and subsequent back injuries from lifting heavy objects, common knowledge and experience could not relate the cutting of one of six tendon sutures to a subsequent malfunction of the extensor mechanism in a finger. A similar observation is logical here. Medical complexity is related to the need for expert testimony. See also Bell v. Umstattd, Tex.Civ.App. (writ dism'd), 1966, 401 S.W.2d 306, 311.

---

15. *Conrey* observes that *Martisek* relied on Lenger v. Physician's General Hosp., Inc., Tex., 1970, 455 S.W.2d 703, which also involved compression fractures in the back and a physician's failure to warn against hard labor. Subsequent back injuries from lifting heavy objects could perhaps be causally related to the doctor's failure to warn.

When the only medical expert in a malpractice case, where expert testimony is, as here, the *sine qua non,* is of the opinion that the defendant's treatment was not a proximate cause of the injury complained of, and there is no expert opinion to the contrary, a directed verdict for the defendants is proper. Conrey v. McGehee, *supra,* 473 S.W.2d at 621.

██ In the instant case it is difficult to determine exactly what injury appellants complain of as resulting from a lack of informed consent.[16] Although not particularly well-developed in Texas cases, other jurisdictions have held (1) that an unrevealed risk that should have been made known must materialize; (2) the unrevealed risk must be harmful to the patient; and (3) causality exists only when disclosure of significant risks incidental to treatment would have resulted in the patient's decision against it.[17]

The only expert testimony was that Mr. Karp was near death prior to the wedge excision operation. Mrs. Karp says she does not complain of the informed consent for the wedge excision. The only expert testimony was that death was also imminent after the wedge excision. There is no expert evidence that says as a reasonable medical probability the mechanical heart caused Karp's death.. The expert testimony at best links the mechanical heart as only one of the "possible" but less likely causes of the secondary cause of death, renal failure. *See* Bender v. Dingwerth, 5 Cir., 1970, 425 F.2d 378, 381; Webb v. Jorns, Tex., 1972, 488 S.W.2d 407, 411.

Finally, there is no proof that Mr. Karp would *not* have consented to the operative procedures had the alleged undisclosed material risks been disclosed.[18]

██ Appellants failed to produce substantial evidence establishing a medical standard as to what disclosures should have been made to Mr. Karp, any violation of that standard, or causation. Thus, the trial court properly directed a verdict for defendants[19] on the informed consent question.

## FRAUD

██ The district court accurately posited the elements of fraud under Texas law, 349 F.Supp. at 837. The trial court concluded that there was neither substantial evidence under Boeing v. Shipman, *supra,* to raise a fact issue for the jury on fraudulent representations, promises or opinions, nor evidence of proximate causation from the alleged representations and Mr. Karp's death. *Id.* at 838. We need not decide the suf-

16. Appellants' theory suggests that Mr. Karp was given the mechanical heart and subsequently died; therefore a causal link. Appellants imply Mr. Karp's secondary cause of death, renal failure, was proximately caused by the mechanical heart implant. As discussed herein, the medical evidence does not support this theory.

17. *E. g.,* Canterbury v. Spence, 1972, 150 U. S.App.D.C. 263, 464 F.2d 772, 790 and n.103. *See generally* Note, Informed Consent—A Proposed Standard for Medical Disclosure, 48 N.Y.U.L.Rev. 548, 549 (and cases cited). One commentator has observed these elements were suggested by the Missouri court in Aiken v. Clary, Mo., 1965, 396 S.W.2d 668, 676, the case that was the principle authority for the leading Texas decision, Wilson v. Scott, Tex., 412 S.W.2d 299, 301–304. Waltz & Scheuneman, 1970, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 647 n.74.

18. Texas courts have not reached the question whether this causal element is measured objectively or subjectively. The better reasoned rule and the general rule is that this is measured objectively. *E. g.,* Canterbury v. Spence, 1972, 150 U.S.App.D.C. 263, 464 F.2d 772, 791; Waltz & Scheuneman, Informed Consent to Therapy, 1970, 64 Nw.U. L.Rev. 628, 647–648.

19. As to both the informed consent and fraud issues, Dr. Liotta, the assistant surgeon and the developer of the prosthetic device, was entitled to a directed verdict for even further reasons. As to fraud, no evidence was presented that Dr. Liotta made any representations, explanations, assertions, or assurances of any kind to Mr. or Mrs. Karp. Furthermore, the Texas authorities have established that team members of a surgical unit are entitled to rely on the consent obtained by the doctor in charge of the operation. Weiser v. Hampton, Tex.Civ. App. (writ ref'd n.r.e.), 1969, 445 S.W.2d 224, 230–231; Bell v. Umstattd, Tex.Civ. App. (writ dism'd), 1966, 401 S.W.2d 306, 313.

ficiency of Mrs. Karp's testimony to raise the factual issue of fraud for the jury, since the final element of proximate causation could not be proven by Mrs. Karp's testimony and was not evidenced according to Texas standards, Bender v. Dingwerth, 5 Cir., 1970, 425 F.2d 378, 381. *See* Allison v. Blewett, Tex.Civ.App. (writ ref'd n. r. e.), 1961, 348 S.W.2d 182; Thomas v. Beckering, Tex.Civ.App. (writ ref'd n. r. e.), 1965, 391 S.W.2d 771. The district court properly directed a verdict on the fraud counts for defendants.[20]

## NEGLIGENCE—THE SURGERY

To meet the proper standard of medical care, the physician must possess a reasonable degree of skill and exercise this skill with ordinary care and diligence.[21] A specialist like Dr. Cooley is bound to exercise the degree of skill and knowledge that is ordinarily possessed by similar specialists. King v. Flamm, Tex., 1969, 442 S.W.2d 679, 681. As with the doctrine of informed consent, *supra*, plaintiffs are obligated under Texas law to produce expert medical testimony to establish a medical standard of conduct, deviation from that standard and proximate cause, *see* Wilson v. Scott, *supra*. Appellants again assert Dr. Cooley testified to the established standard and that he did not meet it. The apparent theory is that Dr. Cooley was negligent in proceeding with the wedge resection when he said it could not be beneficial. This language, however, can not be considered alone as a standard, even if it were construed to be one; rather, it must be read in the context of his total testimony, which in no wise establishes negligence. Appellants

also failed to raise a fact issue on the proximate cause question. *See* Hart v. Van Zandt, Tex., 1966, 399 S.W.2d 791. *See* discussion of proximate cause under informed consent, *supra*. Since the expert testimony failed to evidence that there were negligent acts or omissions by defendants or that any of their acts or omissions were a proximate cause of Mr. Karp's death, a directed verdict for both defendants was proper.

## EXPERIMENTATION

Appellants contend that the trial court erred in directing a verdict on the issue of experimentation. They acknowledge that no Texas case has expressly dealt with a cause of action based on experimentation, but assert that our court's decision in Bender v. Dingwerth, 5 Cir., 1970, 425 F.2d 378, suggests that the decision as to what is actionable experimentation should be left to a jury. We do not agree.

A Texas court bound in traditional malpractice actions to expert medical testimony to determine how a reasonably careful and prudent physician would have acted under the same or similar circumstances, e. g., King v. Flamm, Tex., 1969, 442 S.W.2d 679, 681; Snow v. Bond, Tex., 1969, 438 S.W.2d 549, 550–551, would not likely vary that evidentiary requirement for an experimentation charge. This conclusion is also suggested by the few reported cases where experimentation has been recognized as a separate basis of liability.[22] The record contains no evidence that Mr. Karp's treatment was other than therapeutic and we agree that in this context an action for experimentation must be measured by traditional mal-

---

20. See note (19) *supra*, as to Dr. Liotta.

21. Wilson v. Scott, Tex., 1967, 412 S.W.2d 299, 301–302; Graham v. Gautier, 1858, 21 Tex. 111, 119. *See* Perdue, The Law of Texas Medical Malpractice, 1973, 11 Hous. L.Rev. 1, 22.

22. *See* Salgo v. Leland Stanford Univ. Bd. of Trustees, 1957, 154 Cal.App.2d 560, 577, 317 P.2d 170; Fortner v. Koch, 1935, 272 Mich. 273, 261 N.W. 762; Owens v. McCleary,

1926, 313 Mo. 213, 223, 281 S.W. 682, 685; Carpenter v. Blake, 1872, 60 Barb. (N.Y.) 488, rev'd on other grounds, 50 N.Y. 696. *See generally* Perdue, The Law of Texas Medical Malpractice, 1973, 11 Hous.L.Rev. 1, 21; Kusanovich, Medical Malpractice Liability and the Organ Transplant, 1971, 5 U.San Fran.L.Rev. 223, 272–276; Comment, Liability and the Heart Transplant, 1968, 6 Hous. L.Rev. 85, 109; Comment, Human Experimentation, 967, 20 Stan.L.Rev. 99, 100–102.

practice evidentiary standards. Whether there was informed consent is necessarily linked to the charge of experimentation,[23] and Mr. Karp's consent was expressly to all three stages of the operation actually performed—each an alternative in the event of a preceding failure. As previously discussed, appellants have not shown an absence of Mr. Karp's informed consent. Causation and proximate cause are also requisite to an actionable claim of experimentation.[24] Even if Dr. DeBakey's testimony, as discussed subsequently, were admitted and did establish a standard and a departure from that standard in using this prosthetic device, substantial evidence as required by *Boeing, supra,* on causation and proximate cause simply is not reflected in the record. That alone would warrant the directed verdict on this issue.

### DR. MICHAEL DeBAKEY

Appellants assign as error the in-chambers interrogation of Baylor Medical School president, Dr. Michael De-Bakey, also a thoracic surgeon, and the refusal of the trial court to allow Dr. DeBakey to testify in open court. Appellants contend his testimony would have been relevant on the issues of informed consent and experimentation. The district court based its exclusion of Dr. DeBakey on his unwillingness to testify as appellants' expert, his continued assertion of a lack of knowledge of the Karp case and Karp's prosthetic device, and the court's belief it lacked authority to compel expert testimony. The court also said that Dr. DeBakey's testimony would create a highly inflammatory and prejudicial situation "serving no useful purpose." 349 F.Supp. at 836.

■ The trial court properly exercised its discretion to consider the admissibility and relevance of Dr. De-Bakey's testimony out of the jury's presence. *Cf.* L'Etoile v. Director of Public Works, 1959, 89 R.I. 394, 153 A.2d 173; 5 Moore's Federal Practice, § 43.11, at 1383 (1974). The need for an in-chambers interrogation is less clear, although the trial court said the purpose was to minimize the increasing publicity of the trial, and to protect the jury. We have reviewed Dr. DeBakey's deposition and the in-chambers proceedings.[25] We do not agree that there was "judicial coercion" of Dr. DeBakey. Dr. DeBakey's deposition and in-chambers testimony are consistent, and his position desiring not to testify as appellants' expert is constant.

■ The rule is well-settled that the standard of appellate review in federal courts is whether the exclusion or admission of expert evidence was clearly or manifestly erroneous. Faircloth v. Lamb-Grays Harbor Co., Inc., 5 Cir., 1972, 467 F.2d 685; Eastburn v. Ford Motor Co., 5 Cir., 1972, 471 F.2d 21; Crawford v. Worth, 5 Cir., 1971, 447 F.2d 738. *See* Salem v. United States Lines Co., 1962, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313. As explained in Bridger v. Union Railway Co., 6 Cir., 1966, 355 F.2d 382, 387:

> "The trial judge's discretion is necessarily broad for he sits in the arena of litigation. He knows from the pleadings the contentions of the parties, the direction which the case will take, and from his experience can predict, as the evidence unfolds before him, the problems with which the jury must wrestle. From his exposure to

23. See articles cited *supra* note (22). Many of the cases traditionally identified as "informed consent" cases have involved use of novel or new medical techniques. *E. g.,* Natanson v. Kline, 1960, 186 Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670. Some commentators have suggested that the duty to preinform is viewed more strictly when a novel or radical medical procedure is involved. *See* Comment,

1970 Wisc.L.Rev. 879, 890 n. 69; C. Wasmuth, Law for the Physician 234 (1960).

24. See cases and articles cited *supra* note (22).

25. Appellees argue that the trial court only based its decision on the in-chambers interrogation, and that the deposition was not offered. It is clear that both the deposition and testimony were considered by the court in making its ruling.

the peculiar circumstances of a particular case, he is best suited to answer Professor Wigmore's determinative question: 'On *this subject* can a jury from *this person* receive appreciable help?' 7 Wigmore, Evidence 21 (3rd Ed. 1940)."

This rule is particularly apropos in a diversity case where the requisite proof for the causes of action alleged is so stringently governed by Texas substantive law. *Cf.* Zajicek v. United Fruit Co., 5 Cir., 1972, 459 F.2d 395, 402–403; 1A Moore's Federal Practice § 0.309[2], at 3330 (1965).

We cannot conclude that the trial court's decision to exclude Dr. DeBakey's testimony was clearly erroneous. His testimony would have shown at most that, in his opinion, *the* pump tested under his supervision was not ready for use in humans and that he would not have recommended its use.[26] He may have demonstrated that the animals tested with a prosthetic device at Baylor died of renal failure, but he refused to state that the prosthetic heart used in those experiments was the reasonable medical probable cause of the renal failure. He repeatedly declined to give an opinion regarding *the* pump used in Mr. Karp stating only that the Karp pump was similar to the ones developed under his supervision.[27] He declined to answer the only hypothetical question propounded, even though he had examined at the court's request Karp's medical records, since he had not personally examined Mr. Karp. While it is conceivable that relevance *might* have been established between Dr. DeBakey's experiments and conclusions regarding his mechanical heart and the Karp device and its use, the record does not supply the link. Further, because of the absence of evidence on proximate cause on the informed consent and experimentation issues, Dr. DeBakey's testimony, even if admitted, would not change the requirement as tested by Boeing v. Shipman, *supra*, to direct a verdict for defendants. We therefore do not disturb the trial court's determination.

## BAYLOR RECORDS

Appellants complain of the trial court's exclusion of reports and documents of a Baylor University College Investigating Committee of the Karp operation. Through its attorneys, Baylor in this action has consistently asserted a privilege conferred by Article 4447d(3), Vernon's Annotated Civil Statutes (1969), which protects from subpoena "the records and proceedings" of any medical organization. Federal courts exercising diversity jurisdiction generally recognize state created privileges. Hyde Construction Co. v. Koehring Co., 5 Cir., 1972, 455 F.2d 337, 340. *See* 9 Wright & Miller, Fed.Prac. & Proc. ch. 7, § 2408, at 330–336 (1971). The trial court reasonably concluded this

---

26. The Texas authorities are in apparent conflict as to the "form" expert testimony should take in medical malpractice cases and whether a statement by one physician that he would have done or not done something differently meets the evidentiary requirements. *Compare* Daniels v. Finney, Tex.Civ.App. (writ ref'd n. r. e.), 1953, 262 S.W.2d 431, *with* Levine v. Carrell, Tex.Civ.App. (no writ), 1934, 68 S.W.2d 259. See also Bender v. Dingwerth, 5 Cir., 1970, 425 F.2d 378, 385; Snow v. Bond, Tex.1969, 438 S.W.2d 549. Dr. DeBakey refused to answer whether it was bad medical practice in 1969 to put a mechanical heart in a human being, although he qualified this subsequently to say that in a "broad, general sense" it would not be "acceptable" ["acceptable" was appellants' counsel's word choice] practice to use such a device "on the basis of one experimental observation." He also said he could not say what would happen if the device was used in human beings.

27. Dr. DeBakey said Karp's pump was "similar" to the pumps developed under his supervision, but said he could not speak about the use of it in Mr. Karp because he was not there. Ms. Anderson, the lab technician, testified as to certain changes in the pumps developed at Baylor near the time of the Karp surgery, and Dr. Cooley testified the Karp pump was biventricular, supporting 100 per cent circulation while Dr. DeBakey's pumps were univentricular, supporting only 30 per cent circulation. The record reflects no other testimony on the relevance of Dr. DeBakey's pump experiments and Dr. Cooley's pump inserted in Mr. Karp. Appellants had the burden of showing the relevance of Dr. DeBakey's experiments, and the record does not indicate this burden was met.

statute protected these documents. The court also examined the documents *in camera*. Appellants submit the documents would impeach defendants, but the record reflects the documents consist only of a "draft" of a report prepared by the committee's counsel and summaries of statements from witnesses appearing before the committee. Given the asserted state privilege the trial judge ruled applicable, *see* 1A Moore's Federal Practice, § 0.309[2], at 3330 (1965), and the doubtful probative value considering the documents' nature, the court's ruling should not be disturbed.

 Appellants' final assignment of error is the trial court's exclusion of a motion picture film showing portions of the Karp operation. No abuse of discretion has been shown. *See* Meadows & Walker Drilling Co. v. Phillips Petroleum Co., 5 Cir., 1969, 417 F.2d 378, 382.

For the foregoing reasons, the judgment of the district court is affirmed.